## LITTLE ROCK FURNITURE MANUFACTURING COMPANY

### *v.* KAVANAUGH.

### Opinion delivered February 23, 1914.

1. VOLUNTARY ASSOCIATIONS—DEBTS—PERSONAL LIABILITY OF EXECUTIVE COMMITTEE.—Appellants supplied furniture to a sub-committee under a contract with the executive committee of the Confederate Reunion, for a certain rent; appellants knew at the time that all the expenses of the reunion were to be paid out of a general fund to be raised by popular subscription. *Held*, the members of the executive committee were not personally liable to appellants under the contract. (Page 588.)

2. VOLUNTARY ASSOCIATIONS—DEBTS—LIABILITY OF EXECUTIVE COMMITTEE.—Creditors can not hold the members of the executive committee of a public enterprise, personally liable upon contracts entered into by the committee, where, when credit was extended, there was nothing to indicate that it was the intention of the parties that the individual members of the executive committee would assume personal liability. (Page 588.)

3. VOLUNTARY ASSOCIATIONS—CREDITORS—DUTY OF EXECUTIVE COMMITTEE.—Where the members of the executive committee of a voluntary association are selected because of their ability to promote and further a public enterprise, and it was known by those who dealt with them, in what capacity they acted, they are chargeable with no higher duty to any creditor than to see that the funds handled by themselves were equitably disbursed and honestly accounted for. (Page 588.)

Appeal from Pulaski Circuit Court, Third Division; *G. W. Hendricks,* Judge; affirmed.

#### STATEMENT BY THE COURT.

Appellants were plaintiffs below, and alleged in their complaint, substantially, the following facts. The plaintiffs are corporations, organized under the laws of the State of Arkansas, and are engaged in the manufacture and sale of furniture. At a mass meeting of the citizens

of Little Rock, held in the summer of 1910, to arrange plans for entertaining the Confederate Reunion in May, 1911, the defendants were selected as an executive committee, with W. M. Kavanaugh as chairman, to control the arrangements to be made for said reunion. That said mass meeting was a mere voluntary association, not incorporated, and had no legal existence, and could make no contracts. That such defendants, as such executive committee, assumed and exercised full control of the affairs of said Confederate Reunion; made all contracts; controlled the collection of the subscriptions and the expenditures of funds, and the making of payments of the obligations incurred in connection with the said reunion. That said defendants, as such executive committee, acted through subcommittees appointed to attend to different departments of the work of caring for the reunion, one of which committees was the Eating and Lodging Committee. That in caring for the visitors, cots and mattresses were necessary, and were used for the reunion.

That on February 23, 1911, the plaintiffs entered into the following contract with the defendants, for the furnishing of cots and mattresses, towit:

"Eating and Lodging Committee, Confederate Reunion, Little Rock, Ark.

"Gentlemen: We hereby jointly agree to furnish, as per samples shown, woven wire top cots, mattresses and pillows for use during the Confederate Reunion in Little Rock, at a rental of one dollar and sixty cents ($1.60) for each complete outfit. Mattresses to be made of felted linters covered with ticking and tufted sufficiently to hold them in shape, and to weigh ten pounds. Size, 2'6"x6'0". Pillows made of felted linters, covered with ticking, and to weigh three pounds.

"Complete outfits in lots of 5,000, 10,000, 15,000, or any number designated by committee will be furnished at above price on the following conditions:

"Contract for first 10,000 to be placed not later than January 15, 1911. Contract for first additional 5,000, or less, to be placed not later than February 15, 1911, and

order for all over 15,000 to be placed not later than March 15, 1911.

"Rents for the above outfits are to be paid as follows:

"One-third cash at the time contract is signed and orders placed; one-third when outfits are delivered to places designated, and the balance the day following the close of the reunion, an ample guarantee to be given by the committee that all payments will be made according to above conditions.

"It is also understood that the committee will reimburse us for all lost or damaged cots, mattresses, or pillows as follows:

"One dollar ($1.00) for each cot; one dollar and thirty cents ($1.30) for each mattress, and thirty cents for each pillow.

"We further agree to submit any damages that may occur to a board of arbitrators, composed of one person selected by ourselves, one by you and the third by the two. We also agree to furnish a bond of $10,000 to guarantee that we will carry out this contract.

"Jones House Furnishing Company,
"By Claudius Jones, President,
"Little Rock Furniture Manufacturing Company,
"By Thomas B. Jacobs, Secretary.

(Endorsed): "Accepted.
"Executive Committee Confederate Reunion,
"By W. M. Kavanaugh, Chairman.
Attest: "Geo. R. Brown, Secretary."

That plaintiffs complied with said contract, upon their part, and furnished the supplies contemplated by the contract to the amount of $17,060.37, and have been paid upon said indebtedness the sum of $13,802.90, leaving due and unpaid to plaintiffs the sum of $3,257.47. That in furnishing said cots and outfits, the plaintiffs relied upon the personal liability of the defendants and extended credit to them.

Appellees filed a general demurrer to the complaint,

and, also, a motion to make other parties defendants, and to transfer to chancery.

The answer contained a general denial of all the material allegations of the complaint, and alleged that the executive committee was but a subcommittee of a general committee, composed of persons who actively participated in all plans and arrangements pertaining to said reunion, and that there were altogether forty subcommittees each having certain authority and responsibility delegated by the general committee.

That plaintiffs, as merchants in the city of Little Rock, were interested in said reunion, and were active in the promotion thereof, and were part of a small number largely profited thereby. That plaintiffs understood that they must depend upon public subscriptions to raise funds necessary to pay off any demands accruing by reason of any materials furnished or services rendered, to said general committee, or to the city of Little Rock, for said reunion, and that said supplies were furnished with the understanding that they would be paid for, if a sufficient fund was raised by public subscription, and each of said plaintiffs did receive their proper *pro rata* of all sums so raised. That each of the plaintiffs subscribed to the fund, out of which claims of the nature of plaintiffs' were to be paid, that is to say, the Little Rock Furniture Manufacturing Company subscribed the sum of $200, and the said Jones House Furnishing Company subscribed the sum of $100; but they have failed to pay their subscriptions.

It was further alleged that on May 5, 1911, the Confederate Veterans' Reunion Association was incorporated under the laws of the State of Arkansas relating to corporations for benevolent purposes, fair associations, *et cetera,* the general purpose of which was to arrange and prepare to take care of, and entertain, the Confederate Veterans who might visit the reunion in Little Rock, in May, 1911, and to apply to that purpose all funds and things of value collected by that association, and to do and perform all other acts necessary to carry

out the reunion plans. And it was provided that no member of said association should ever be liable, for any indebtedness of said association, nor upon any obligation or contract of said association. That this association handled and disbursed all funds raised on account of said reunion, and plaintiffs received from it their proper *pro rata* share of all its funds.

There appears to be no serious conflict in the evidence. Appellants testified they knew nothing of the incorporation of the Confederate Veterans Reunion Association, and furnished the supplies sued for under their contract herein above set out, and it appears this contract was made before the incorporation of this association, and its existence is therefore of no importance. Appellants say they furnished the supplies on the faith of the credit of the executive committee; but there is no evidence that this committee was so advised, until after the reunion had been held, and the supplies furnished.

It will be observed that the proposition submitted by appellants was a joint one, and the account was kept upon the books of the Little Rock Furniture Manufacturing Company; and it will also be observed that the proposition was addressed to the Eating and Lodging Committee, and it was accepted by that committee, although it was endorsed as accepted by the chairman and secretary of the executive committee.

Wide publicity was given to the reunion, and a very large number of people were concerned in its promotion. A committee solicited funds from the business concerns, and also from the citizens of Little Rock, and a number of other towns of the State raised public subscriptions, and these operations extended over the period of time covered by appellants' contract. Appellants knew the money to defray the expenses of the reunion was being thus raised by popular subscriptions, and each of them had subscribed for that purpose, and one of them made a second subscription to this fund, and the manager of the appellant Jones House Furnishing Company was the chairman of the subcommittee, having the duty of secur-

ing the necessary halls. Appellants' proposition called for "an ample guarantee to be given by the committee that all payments will be made according to the above conditions;" but this demand was not insisted upon, although the manager of one of the corporations testified he asked the executive committee for a guaranty, but this request was never complied with. The Confederate Veterans' Reunion Association disbursed all its funds, and there was found to be quite a deficit, but it was supposed that $12,000 would extinguish this deficit, and the quorum court of Pulaski County made an appropriation of that amount for that purpose; but it was found that this appropriation paid only .825 per cent of the balance due the various claimants, and the appropriation was pro rated on that basis. Appellants sued for the balance due them and upon a trial before a jury a verdict was returned in favor of defendants. A number of questions were raised at the trial, and are discussed in the briefs which we find it unnecessary to discuss in this opinion, because of our view of the law applicable to the facts of this case.

*Dan W. Jones* and *E. L. McHaney,* for appellants.

There is no question that the appellees at the time of making the contract were members of a voluntary association, and acted within the scope of their authority in making such contract. They come clearly within the rule of law that "each member of an association is liable for the debts thereof incurred during the period of his membership, and which have been necessarily contracted for the purposes of carrying out the objects for which the association was formed." 4 Cyc. 311; 64 Ia. 220, 52 Am. Rep. 436; 23 Wis. 538, 99 Am. Dec. 203; 26 Wis. 286-291; 6 Wend. 649, 22 Am. Dec. 556.

*Morris M. & Louis M. Cohn,* for appellees.

The cases cited by appellants on the question of liability of the appellees, have no application to this case. Clearly, under the evidence, appellees are not individually liable.

SMITH, J., (after stating the facts). Appellants say the evidence is practically undisputed, and that a verdict should have been directed in their favor. That this is true because appellees were members of a voluntary association, and acted within the scope of their authority in making the contract sued on, and that they are therefore within the rule of law that, "Each member of an association is liable for the debts thereof, incurred during his period of membership, and which have been necessarily contracted for the purposes of carrying out the objects for which the association was formed." The law is so stated to be in 4 Cyc. page 311. Appellants cite and quote freely from the cases of *Lewis* v. *Tilton*, 64 Iowa 220; 52 American Reports 436, and *Fredenhall* v. *Taylor*, 23 Wis. 538; 99 Am. Dec. 203.

In *Lewis* v. *Tilton, supra,* a lease had been taken by the executive committee of a temperance club, and in a suit for the rent it was there said:

"It is insisted that the lease shows that credit was extended to the club, and that the contract was made with it; that the principal was named, and therefore the defendants cannot be made individually liable. This line of argument possibly would be conclusive, if there was a principal. But there is none. The club is a myth. It has no legal existence, and never had. It can not sue or be sued. The defendants contracted, in the name of a supposed principal; that is, they claim there was a principal for whom they were acting, but it now appears that there was no principal, known to the law. But under the allegations of the amended petition, it should be assumed, we think, that there was as a matter of fact, a body of men associated together for a benevolent purpose, who had assumed the name above stated, for the avowed purpose, by their united efforts, of suppressing intemperance. There is however some doubt in our minds, whether it can be said, that the plaintiff extended credit to an organization that had no legal existence. As the law does not recognize such an organization, we are at a loss to know how, or why, it can be said as a matter

of law that the plaintiff contracted with, and extended credit to, a mere myth. In legal parlance, the organization can not be named. It has no habitation or place of abode. * * *

"But it is said, these defendants did not contract. They certainly represented that they had a principal, for whom they had authority to contract. They, for or on behalf of an alleged principal, contracted that such principal would do and perform certain things. As we have said, there is no principal, and it seems to us that the defendants should be held liable, and that it is immaterial whether they be so held because they held themselves out as agents for a principal that had no existence, or on the ground that they must, under the contract, be regarded as principals, for the simple reason that there is no other principal in existence." * * *

But the force of this opinion as an authority in the instant case is lost, when the following language from that case is quoted:

"It is also insisted that a fund was provided for the payment of debts, and hence it must be presumed that the plaintiff contracted in reliance upon such fund, and therefore the defendants can not be made individually liable. What the fact may be we are not advised, but certainly this does not appear on the face of the petition, and we have looked into the lease, and there is no provision in it from which such an inference can be drawn."

In the case of *Fredenhall* v. *Taylor, supra*, it was decided that "a committee appointed by an unincorporated association to make arrangements for a public exhibition, are individually liable for work necessary for the occasion, which a subcommittee of their number procured to be done, although in making the contract the subcommittee assumed to act as officers of the association."

But that case was appealed from a judgement returned in favor of defendants, by direction of the trial court, and in discussing the facts of that case the court said "It is not to be presumed in this case that the plain-

tiff contracted upon the credit of the association. And there is proof tending to show, that, although he fully understood that the committee was acting for the association, yet he relied upon the personal liability of the committee.''

The cause was remanded for a new trial and at this trial the court charged the jury as follows: ''If the plaintiff entered into this contract and performed this work, believing that Spencer was acting in that behalf for a committee of the State Fireman's Association, consisting of all the defendants, and if the plaintiff relied for payment upon the personal responsibility of the defendants, whom he believed constituted such committee, then if either Leich, Kreiss, or Taylor, with full knowledge that Spencer had assumed to act for such committee, that the plaintiff contracted upon the faith of the personal responsibility of the alleged members thereof, and that the work had not been paid for, assured the plaintiff that he should be paid for his work, made no objection to the manner in which the contract had been made, and participated in using the reservoir—such acts, with knowledge of the facts aforesaid, are a ratification of the contract and render the defendants thus ratifying it liable thereupon; and this although no such committee or subcommittee were in fact appointed, and although the contract was made without the advice, consent or approval, of the defendants so ratifying it, and further, although the reservoir was unnecessary for the purpose of the tournament.'' This instruction was approved as a correct declaration of the law, and the court in approving it said ''As the defendants had no principal—no legal association or body which they could represent, act for or bind—they must be held in all the transactions, to have represented, acted for and bound only themselves, in the same manner and to the same extent as if there had been no assumed authority to act for the State Fireman's Association.'' *Fredendall* v. *Taylor,* 26 Wis. 286.

In the case of *Heath* v. *Goslin,* 80 Mo. 310, 50 Am.

Repts. 505, it was said: "It is well settled that although a party may be a mere agent, and known to be such, yet, if he contracts in his own name, or in his name as agent, when his principal is incapable of contracting, or is irresponsible, the law presumes he intended to bind himself. Story on Agency, § § 281, 282." And in that case a number of authorities, both English and American, were reviewed, and the regents of the school in which the plaintiff had taught were held liable for the teacher's salary, but the court there said, "Had the people subscribed a certain sum to promote the project, to be paid annually, or otherwise, and the defendants had engaged the plaintiff with the understanding that they were mere agents of this public body to disburse the fund subscribed, she could not have held them personally bound. Story on Agency, § 287."

Other cases which discuss and illustrate the principles here involved are: *Davidson* v. *Holden,* 10 Atl. 515; *Bennett* v. *Lathrop,* 42 Atl. 634; 71 Am. St. 222; *Lawler* v. *Murphy,* 20 Atl. 457; 8 L. R. A. 113, and other cases cited in notes 61, 62 and 63, 4 Cyc. page 311.

In the recent case of *Belding* v. *Vaughan,* 108 Ark. 69, 157 S. W. 400, the plaintiffs and defendant were jointly interested in forming a corporation, and defendant signed an agreement for the lease of a machine from the plaintiffs, when the corporation was formed, and agreed to pay a definite sum of money therefor, at a fixed time, but the corporation was never organized. Suit was brought upon the theory that defendant had contracted in the name of a nonexistent principal, and the court there said:

"Appellants invoke the familiar rules, that one becomes personally liable who acts as agent for an undisclosed principal, or who assumes to act for a principal who does not exist; but neither of those rules are applicable to the facts of the case, for appellee did not act for an undisclosed principal, nor did he assume to act for a principal who did not exist. His undertaking was to act for the principal (the proposed corporation), when

it came into existence, and not before. Therefore he is not liable personally. *Hersey* v. *Tully,* 8 Colo. App. 110, 44 Pac. 854. If the corporation had, in fact, been organized pursuant to the terms of the subscription contract, then the obligation of appellee would have been complete, for he undertook to pay as the agent of the corporation when organized, and if, upon the occurrence of that event, authority from the corporation had been withheld then his personal obligation and liability would have attached, for his undertaking was, as before stated, to pay as agent of the corporation as soon as it was organized. That would have constituted a case of one who had impliedly contracted that he had authority, in the contingency named, to act for the corporation, and the obligation would have rested on him to make good the contract if the actual authority had been withheld.

"It is also argued that appellee is liable as a promoter of the proposed corporation, who induced a third party to extend credit, and is personally liable. The rule in which liability in that case rests is, however, limited to dealings with strangers who act in expectation of payment from the prospective corporation. 2 Cook on Stock, Stockholders, etc., ¶ 705. The rule does not apply in this case, for the reason that appellants became equally interested with appellee in the promotion of the affairs of the proposed corporation, and there is no reason why either one should be liable to the other except under the strict letter of the contract. If appellee had induced appellants to accept an unconditional obligation of the proposed corporation, then there would be reason for holding him personally liable as a promoter of the corporation; but that is not the case here, for, as before stated, the parties were jointly interested in the enterprise, and by the terms of the contract itself the obligation to pay was based on the condition that the corporation should thereafter be organized. The rule with reference to liability on that score is stated by the author of a recent text-book as follows: 'Promoters are merely persons who, for purposes of their own, bring about the forma-

tion of the corporation. In assuming to make contracts in its name or behalf before it comes into existence, they do not stand in the relation of agency, and they represent only themselves, inasmuch as a nonexisting body can not have agents' Alger on the Law of Promoters and Promotion of Corporations, p. 199.

"Stress is laid upon the language of the contract stating the promise to pay on a definite date, 'or upon the organization of the corporation,' as characterizing the obligation as an absolute one to pay on the date named, whether the organization was completed or not. Authorities are cited in suits based upon promissory notes where similar obligations are construed to amount to an absolute one to pay on the date named, or earlier upon the happening of a certain contingency. Ordinarily that is the proper interpretation of a written obligation for the payment of money; but when this contract is read as a whole, and in the light of the attending circumstances, it is manifest, as we have already shown, that it was not intended as an absolute and unconditional obligation to pay, but was merely an obligation to pay upon the organization of the corporation, which the parties to this contract were jointly interested in organizing."

Where one assumes to act as agent for another he impliedly represents that his principal has existence, and that he has authority to act for him, and if either of these things be false, the agent becomes personally liable. But "when the agent makes full disclosure of the facts constituting his authority, as when he shows to the other party the power of attorney, or letter of instructions under which he acts, the question of his authority becomes a mere question of construction or of law, and no warranty of the sufficiency of the authority can be implied." Tiffany on Agency, § 92; *McReaney* v. *Eshelman,* 31 Pac. 35; *Jefts* v. *York,* 10 Cush. 392.

Appellants contracted for the sale of their supplies with full knowledge of all the facts in regard to the connection of appellees with the reunion. These gentlemen were selected to serve upon the executive committee be-

cause of their executive capacity, and public spirit, and all persons who dealt with them knew the only source of their revenue. Appellants had this knowledge for they were contributors to this public subscription, and all other creditors must also have had this knowledge for none of them have brought suit for the balances due them.

Facts such as we have stated were evidently in mind of the author when section 287 of Story on Agency was written. That section reads as follows: "But, although it is thus true that persons, contracting as agents, are ordinarily held personally responsible, where there is no other responsible principal to whom resort can be had; yet, the doctrine is not without some qualifications and exceptions, as, indeed, the words 'ordinarily held' would lead one naturally to infer. For, independent of the cases already suggested, where the contract is, or may be treated as a nullity, on account of its inherent infirmity or defective mode of execution, other cases may exist, in which it is well known to both of the contracting parties, that there exists no authority in the agent to bind other persons for whom he is acting, or that there is no other responsible principal; and yet, the other contracting party may be content to deal with the agent, not upon his personal credit, or personal responsibility, but in the perfect faith and confidence, that such contracting party will be repaid and indemnified by the persons who feel the same interest in the subject-matter of the contract, even though there may be no legal obligation in the case. Thus, for example, if private persons should subscribe a sum toward some charitable object, and should request an agent to employ tradesmen, and others, to supply materials to carry it into effect; and it should be distinctly made known by the agent, that the tradesmen and others were not to look to him, or to the subscribers personally, for payment; but that they must solely depend upon the success of the charitable subscription, and the state of the funds; and the supplies should be furnished with this clear understanding; there could be no doubt that neither the subscribers (at least, beyond their subscriptions), nor

the agent, would be personally responsible. Such occurrences often take place in cases of voluntary charitable societies; and especially in cases of such charities, conducted by females, some of whom are married and some unmarried; where the tradesmen, who furnish supplies, are understood to trust entirely to the state of the funds, and to rely for reimbursement solely upon the funds, which may, from time to time, be obtained from charitable and beneficent persons. For it has been well remarked, that few persons would be willing to become members of committees of bible societies, and other voluntary religious and eleemosynary institutions, if they were held to be personally bound * * * for articles furnished in furtherance of such meritorious objects. * * * Similar transactions may take place in relation to agents, acting for the public at large, or for particular public bodies, in cases avowedly beyond the scope of their authority, and yet, for the benefit of the public at large, or for particular public bodies, where the other contracting party may rely solely upon the public liberality and sense of justice to award him a suitable compensation, without in any manner giving credit to the agents, or looking to them for compensation.''

And the same learned author after discussing fully the liabilities of agents to third persons, said: ''The truth, however, is that the same general principle prevails in all these cases notwithstanding their apparent diversity of form and decision. They are all answered by the same general inquiry: To whom is the credit knowingly given, according to the understanding of both parties? This inquiry is sometimes a matter of fact as where the contract is verbal or unwritten, and sometimes a matter of law, as where it depends upon the true construction of the terms of a particular written instrument. The law in all these cases pronounces the same decision, that he to whom credit is knowingly or exclusively given is the proper person who incurs liability, whether he be the principal or the agent.'' Story on Agency, § 288.

Under this test, we think appellees are not liable.

There is nothing in the proof, as we understand it, which would have given appellants any reasonable right to expect appellees to assume any personal liability to them, or to any one else. Ignoring the fact that the Confederate Veteran Reunion Association was incorporated and took charge of all the funds, the appellees were acting in a capacity known to all persons who dealt with them, and were chargeable with no higher duty to any creditor than to see that the funds were honestly accounted for, and equitably disbursed. This they have done, and the judgment of the court below in their favor will be affirmed.