78 A.3d 471

**Kimberly PINSKY et al.**

v.

**PIKESVILLE RECREATION COUNCIL et al.**

**No. 0052, Sept. Term, 2012.**

Court of Special Appeals of Maryland.

Oct. 30, 2013.

Kimberly Loew (Howard J. Needle, on the brief) Baltimore, MD, for appellant.

Roger N. Powell, Pikesville, MD, for appellee.

Panel: ZARNOCH, KEHOE, JAMES R. EYLER (Retired, Specially Assigned), JJ.

ZARNOCH, J.

One perceptive legal observer has noted that "[n]onprofit associations take many shapes and sizes, and the law that applies to them has traditionally consisted of a vague combination of statutes and common-law principles that create a number of problems for nonprofit associations." Elizabeth S. Miller, *Doctoring the Law of Nonprofit Associations with a Band-aid or a Body Cast: A Look at the 1996 and 2008 Uniform Unincorporated Nonprofit Association Acts*, 38 Wm. Mitchell L.Rev. 852, 855 (2012). This case is a prime example of those problems.

In 2008, Pikesville Recreation Council ("PRC") hired appellants Kimberly Pinsky and Elizabeth Ann Burman to work in one of its pre-schools for the 2008–2009 school year. At the end of the school year, but before the end of their respective contract terms, PRC terminated Pinsky and Burman and stopped paying them. They sued PRC and the individual officers of PRC in the Circuit Court for Baltimore County to recover the payments still owed to them, plus treble damages, attorney's fees, and costs. After a three-day bench trial, the circuit court entered judgment for Pinsky and Burman against PRC, but rejected the claims against the individual defendants. The court also declined to grant appellants' motions for sanctions and for attorney's fees and costs. They now appeal the adverse judgment with respect to the individual defendants and the court's rulings on sanctions, attorney's fees, and costs.[1]

## FACTS AND LEGAL PROCEEDINGS

PRC was an unincorporated nonprofit association that, until 2009, oversaw recreation programs in the Pikesville area. It was governed by an elected Board of Directors ("Board") and operated under a Constitution, Bylaws, and a Policy Manual. PRC conducted various sports and education programs and received most of its funds from registration fees for the programs. Some programs had their own checkbooks, while others used the general PRC bank account. PRC had as many as fifteen checking accounts and took in gross revenues of "$750[,000] to close to a million dollars" a year from the mid–1990s to 2008. Among its many programs, PRC operated a number of pre-schools. In July 2008, PRC hired Pinsky and Burman as a teacher and an assistant teacher, respectively, for its pre-school at the Fort Garrison Elementary School for the 2008–2009 school year. The contracts specified that Pinsky and Burman would be employed from August 18, 2008 to

---

1. Only six individual officers (collectively, appellees) are before this Court, as PRC did not appeal the judgment for damages, costs, and attorney's fees against the entity.

June 22, 2009. Pinsky would receive a gross salary of $24,993.50, while Burman would receive $16,887.75. Payments would be made "at regular payroll periods through out [*sic* ] the twelve month period beginning August 18th, 2008 and terminating on August 17th, 2009." Both contracts could be terminated by PRC for "just cause" and with written notice. The signature line on both contracts states "Pikesville Recreation Council." Michel Snitzer, then the president of PRC, signed Burman's contract, while his wife, Sandy Snitzer,[2] signed Pinsky's contract.

Around the time Pinsky and Burman were hired, PRC was facing financial and organizational difficulties. In fact, the Baltimore County Department of Recreation and Parks[3] was considering decertifying PRC in 2008. PRC continued to operate its programs throughout 2008, but in January 2009, a successor entity called the Greater Pikesville Recreation Council ("GPRC") was certified by the County and took over the recreation activities for the Pikesville area.[4] Certification was described at trial as a process that "gave . . . the Greater Pikesville Rec Council [the right to] access to all fields, all schools, everything that [Baltimore] County runs programs on." Once decertified, PRC was "no longer allowed to run any programs on any field or within any school." All program registration fees that came in after January 2009 went to

2. At the time, Sandy Snitzer supervised PRC's pre-school programs.

3. The Baltimore County Department of Recreation and Parks "works with 45 volunteer recreation and parks councils to sponsor a wide range of leisure time programs, activities and special events." *Program Division Overview*, Baltimore County, Department of Recreation and Parks, http://www.baltimorecountymd.gov/Agencies/recreation/program division/index.html. *See also* Baltimore County Code (2003), § 30-2-102 (providing that Baltimore County "may join or cooperate with" a "County Community Recreation Council" for "the purpose of providing, establishing, and conducting recreation centers, playgrounds, parks, and other recreational facilities and activities").

4. GPRC is incorporated in Maryland and continues to run recreation programs in Pikesville. *See generally About GPRC*, Greater Pikesville Recreation Council, http://www.pikesvillerec.org/info/dept/details.aspx? DeptInfoID=1029.

GPRC rather than PRC, as did all of PRC's equipment and records.[5] As a result, by the spring of 2009, PRC did not have "enough cash flow in to write checks to cover all the programs [and] expenses for the preschool."

Pinsky and Burman received identical letters, dated May 22, 2009, from PRC informing them that they would be terminated effective June 12, 2009.[6] The letters were written on PRC letterhead and were signed by Steven Engorn, PRC's treasurer. The stated reason for the termination was that the "Department of Recreation and Parks of Baltimore County has informed [PRC that it] will no longer be able to run any of [its] day care centers after the end of the current school year as they have turned the operation of these centers over to another organization." In a follow-up letter to Burman dated May 29, Engorn wrote that "[a]s a result of this employment termination, your income from our organization will cease as of that date.... [W]ith this employment termination, your income will be $3,518.27 less than you were expecting to earn from 9/1/2008 thru [sic] 8/31/2009." Both Pinsky and Burman received their last paychecks from PRC at the end of May 2009. They continued working through the end of the school year, until June 12, 2009.[7]

Pinsky and Burman filed a complaint against PRC [8] and nine individual Board members [9] on November 25, 2009. They

5. GPRC did not, however, take over PRC's debts.

6. PRC's pre-school program followed the Baltimore County school schedule, and June 12 was the last day of school for the County that year.

7. At trial, Pinsky and Burman testified that GPRC hired them to work in its pre-school program for the 2009–10 school year. According to GPRC's website, they still work there. *See Discovery Staff*, Greater Pikesville Recreation Center, http://www.pikesvillerec.org/info/dept/staff.aspx?ContactGroupID=765.

8. PRC was not represented by counsel at the trial and did not present a defense.

9. The nine individuals were: Michel Snitzer, Sandy Snitzer, Marc Horwitz, Steven Engorn, David Kleinman, Stephen Barber, Stuart

alleged that PRC and the officers breached their employment contracts and sought unpaid wages, as well as treble damages, reasonable counsel fees, and costs under the Maryland Wage Payment and Collection Act, Md.Code (1991, 2008 Repl.Vol.), Labor & Employment Article ("LE"), § 3–507.1.[10] Pinsky and Burman thus sought $16,745.97, plus interest, and $11,985.33, plus interest, respectively, in addition to counsel fees of $9,577.10 and costs.

The litigation proceeded to discovery, albeit with some difficulty. The deposition of Engorn, PRC's former treasurer, did not take place as scheduled in October 2010 because Engorn's counsel allegedly failed to inform his client of the deposition.[11] Appellants moved for sanctions, but the circuit court never ruled on the motion. In another instance, counsel for the defendants failed to appear for a court-ordered settlement conference. Appellants again moved for sanctions, and that motion was denied.

A bench trial began on May 31, 2011 and continued on November 7 and November 14. Appellants' theory of the case focused on allegations of financial mismanagement by various PRC Board members. Pinsky and Burman testified about their employment with PRC and the amount of their legal fees. The seven individual defendants testified about their own involvement in PRC, and, to the extent that they were knowledgeable, PRC's operations and finances. Overall, the court heard from:

- Michael Snitzer, an officer of PRC for about fifteen years and its president until October 2, 2008. He was a volunteer.[12] Snitzer stated that he had no involvement with PRC after October 2, 2008.

---

Abell, Harry Veditz, and Rabbi Moshe Markowitz. The parties stipulated to the dismissal of Rabbi Markowitz before trial, in February 2011. Appellants also moved to dismiss Sandy Snitzer at the beginning of the trial, a motion the circuit court granted with prejudice. This action is not before us.

10. Now codified at LE § 3–507.2 (2012 Supp.).

11. The deposition eventually took place in February 2011.

12. The court dismissed Snitzer at the end of appellants' case, because the alleged breach of contract occurred in 2009, after Snitzer was no

- Steven Engorn, PRC's treasurer in 2008 and 2009. He was a volunteer. He testified that he believed that Pinsky and Burman were terminated with "just cause" because PRC was being decertified and no longer had the funds to pay them.

- Marc Horwitz, PRC's president from October 2008 through September 2009, when PRC stopped functioning. He was a volunteer.

- David Kleinman, an at-large Board member and then, in 2008 and 2009, a vice president. He was a volunteer. He testified that his primary responsibility as vice president was public relations. He also stated that Board meetings usually occurred right after the general PRC meetings, about three or four times a year.

- Stephen Barber, an at-large Board member and then another vice president from October 2008 through February 2009.[13] He was a volunteer.

- Stuart Abell, an at-large Board member from October 2008 through 2009. He was a volunteer.

- Veditz, a Board member for about ten years, as an at-large member, vice president, and then secretary in 2008 and 2009. He was a volunteer.

Appellants also called other witnesses who had been involved with PRC in the past. Alan Taylor was the chairman of PRC's soccer program from approximately 1997 through 2008. Taylor worked with and for Snitzer, one of the former PRC presidents, on an informal basis. He testified that there

---

longer a member of PRC's Board. This issue is not before us. *See* n. 17, *infra.* Even if the issue were present, we see no error in the court's ruling.

**13.** Because Barber testified that he was no longer a Board member after February 2009, arguably he should have been dismissed as a party for the same reasons as Michael Snitzer, *viz.,* he was not a Board member when Pinsky and Burman were terminated in June 2009. However, Barber did not raise this issue before the circuit court, nor has he raised it on appeal.

were "a lot of things that bothered" him about how Snitzer ran PRC, such as PRC paying bills for private sports tournaments run by Snitzer's companies and Snitzer occasionally depositing payments intended for PRC into his business accounts.

Allen Pogach was the treasurer of PRC from approximately December 1997 to May 2000. He reviewed PRC's records from after his tenure as treasurer and found what he thought were a "great number" of irregularities in PRC's accounting practices. For example, he testified that PRC's policies required that all checks and withdrawals by a program must bear the signature of the program treasurer and either the chairperson or the vice chairperson. Yet many of the records Pogach reviewed from PRC's soccer program had only Snitzer as the signatory.

Erwin Burtnick, an expert witness in forensic fraud and accounting, also testified on behalf of appellants. He reviewed PRC's records and found, in his view, a number of anomalies. For example, several payments were made from the basketball program's funds to Barber, an at-large Board member and supervisor of the program, for purposes such as "credit card bills" and "a drug program in Florida," or, in other words, "a few things ... that didn't appear to be recreation related items in the program." Burtnick also identified payments to Snitzer that he viewed as questionable. His opinion was that there was a lot of "com[m]ingling of, of private businesses, business accounts, especially those of Mr. Snitzer with the non-profit" PRC. Burtnick concluded that PRC was "totally mismanaged" and that Snitzer and Engorn, as the president and treasurer, respectively, were primarily responsible.

Regarding the pre-school program, Burtnick testified that PRC had the money to pay Pinsky and Burman. Parents of participating children either "paid in advance" or paid "monthly deposits ... until something like July ... while [Pinsky and Burman] were not being paid." Burtnick estimated that the pre-school program would have resulted in about "$37,000 in

prepayments" alone and that the program "was a money maker for PRC, . . . even after the salaries went out."

Pinsky and Burman moved for summary judgment at the close of their case, which the court denied. In discussing the motion, the court commented on the potential liability of the PRC officers:

Court: What I have before me is a breach of contract case. It's likely judgment for the breach of contract will be entered against Pikesville Recreation Council, it's put on no defense. As Pikesville Recreation Council is an unincorporated association, all of its members would be responsible for the judgment. All of its members.

[Appellees' counsel]: Did you want me to—

Court: That's the law on unincorporated associations.

[Appellees' counsel]: Actually, Your Honor—

Court: Which seems to be what we have here, an unincorporated association, that's what Pikesville Recreation Council is.

[Appellees' counsel]: Okay. There is no—

Court: Clearly a case has been made out for judgment to be entered against Pikesville Recreation Council, I don't know why the Court should consider to keep going forward as to these individual Defendants. If they're members of the council, they're going to be liable for the judgment just like everybody else. . . . There's no defense against Pikesville Recreation Council, there's no barrier to the Court entering judgment for the Plaintiffs against Pikesville Recreation Council and then the members of that recreation council, at the time of the breach, whoever those people are, are responsible for that judgment.

Despite this initial suggestion of liability, the trial judge later indicated that the officers would not be liable in the event that a judgment was entered against PRC alone:

Court: . . . There's a breach of contract claim, that's what there is. It's a breach of contract by Pikesville Recreation Council.

[Appellants' counsel]: And, and—

Court: That's what there is and, you know, frankly, it seems, the testimony is clear, it's an unincorporated association. I don't know how you get past [Md.Code (1974, 2006 Repl.Vol.), Courts & Judicial Proceedings Article ("ACJP"), §] 11–105 that says the money judgment against the unincorporated association is enforceable against the assets of the group, whatever that is, but not against the assets of any member.

[Appellants' counsel]: And that, that's why we, that brings us back to the point we made earlier, that's why it's important to get a judgment against the individual Defendants in this case.

Court: But what is the theory against, what's the claim against them?

[Appellants' counsel]: I cited you statute—

Court: It's a breach of contract.

[Appellants' counsel]: Yes. They were responsible for breaching this contract. They didn't—

Court: But there won't be any judgment against them because we got [CJP §] 11–105.

[Appellants' counsel]: That doesn't say you can't get a judgment against the individual members of an unincorporated association and I cited you statute—

Court: So you're saying that the breach of contract, that the contract that exists here is between the Plaintiffs and Mr. Barber and Mr. Abell and Mr. Veditz and Mr. Engorn?

. . .

Court: All right. The contracts, there's two contracts at issue and they're signed by Sandy Snitzer,[14] Pikesville Recreation Council. So none of these individuals signed these contracts. . . . So I don't have any testimony by the Plaintiffs that they entered into contracts individually with any of these people. . . . So if they didn't enter into con-

---

14. Burman testified that Michael, not Sandy Snitzer, signed her contract, and the record before the Court reflects that fact.

tracts with these individuals, these individuals can't be held liable for breach of contract.

At the end of the third day of the trial, the judge made findings of fact:

There's no dispute that each of the Plaintiffs had an employment agreement, those employment agreements were dated August 18th of 2008. They provided that each of the Plaintiffs would be paid through August 17th of 2009. Ms. Burman's contract was for a total of $16,887.75. Ms. Pinsky's contract was for $24,993.50. Either of those agreements could be terminated at any time with just cause. The contracts were terminated by a letter from PRC dated, letters, dated May 22nd, 2009 terminating them effective June 12th of 2009. I think there was good cause [15] to terminate them in the sense that there was, the program was not going to be continued but the evidence is sufficient that the Plaintiffs had already performed work for which they had not been paid at the time of their termination and that they were owed money by Pikesville Recreation Council. PRC has breached their contract, their contracts, both contracts, and judgment will be entered in favor of the Plaintiffs against Pikesville Recreation Council. Judgment in the amount of $5,581.99 for Ms. Pinsky and $3,893.29 for Ms. Burman.

The judge next considered the request for treble damages and awarded them:

The Plaintiffs have asked that I triple those amounts on behalf of each of them because of bad faith shown by PRC in not making payments to them. Plaintiffs have contended that since there was no bona fide dispute as to what was owed, the damages should be tripled. On this record it

---

**15.** The circuit judge's use of this phrase is not clear, given her later conclusion that there was not a bona fide dispute over the wages. But as PRC has not taken a cross-appeal, the issue is not before us. If appellees press the issue, the circuit court will have the opportunity to address it in the context of the officers' potential liability for the breach of contract.

seems to me that Pikesville Recreation Council did not have a bona fide dispute so much as PRC believed that it could terminate the contracts and not pay them. There's been no evidence that they, that was, that conclusion was reached by PRC based on legal advice. I don't know why they thought that they did not have to pay the Plaintiffs for work which was performed. They haven't shown good cause for not having paid for the work that was already performed. I think it is appropriate in this case to triple the damages. So I will award a total of $16,745.97 to Ms. Pinsky for, against PRC and a total of $11,679.87 for Ms. Burman against PRC.

The judge then considered the claims against the six individual defendants:

There's no evidence on this record that any of the individual board members entered into a contract with the Plaintiffs. The case is dismissed as to all of the individual Defendants. Mr. Engorn's situation is certainly the most troubling because, especially to the sense, in the sense that he was writing checks for debts that were not PRC's obligation, specifically payments to Mr. Powell.[16] While that situation is troubling, and I don't find any justification for it on this record, I also don't find any legal theory under which to hold Mr. Engorn liable, none that has been pled in this Complaint anyway or is before the Court. I think that the case was a simple breach of contract case, maybe the Defendants verbally raised some charitable immunity defense. It seems like a lot of discovery and effort was spent on that. I don't think it was ever properly before the Court.

Finally, the judge summarized the award of damages and costs:

---

16. There was testimony and evidence at trial that counsel for the individual defendants, Roger Powell, received some payments for his services from PRC, even though he was not representing PRC. Although this evidence may have been relevant to appellants' theory at trial that PRC's finances were mismanaged, it is not before us on appeal, as their arguments focus on the individual defendants' liability on a purely contractual matter.

I think that tripling the damages is sufficient compensation to the Plaintiffs for what they have undergone in this case. I don't think that a substantial award of attorney's fees is merited on this record and so I'm not awarding any attorney's fees. Plaintiffs are entitled to their costs. Those costs would be typical court costs such as filing the case, whatever cost they can prove. I think that that does resolve all of the issues that were before the Court.

. . . .

Those are the costs that I'm awarding. Just the costs of the suit, as contemplated by the Maryland rules and statutes.

Appellants filed a timely motion to alter or amend the judgment, which the court granted in part and denied in part in an order filed March 1, 2012. The court first denied appellants' request to hold the individual Board members liable. It observed that "[n]o Maryland law and no Maryland case is cited which makes members of a voluntary membership organization who serve as officers or Board members personally liable for payment of contracts executed in the name of the organization," and it "decline[d] to adopt new law in this case."

The court also summarized the evidence before it showing "sloppy management of PRC," including that "[s]ome of the individual defendants testified that they did not understand their participation on the Board to mean financial oversight of PRC." It remained troubled by the payments made by Engorn, the former PRC treasurer, from PRC's accounts to counsel for the individual defendants, as "[t]here was no evidence Mr. Engorn was ever authorized by PRC to pay legal expenses for himself and the other individual defendants from PRC funds." The court concluded, however, that "[t]he mismanagement of PRC's finances in this case did not amount to fraud," and, in any event, that the complaint "alleged neither fraud nor bad faith."

Finally, the court granted the request for an award of attorney's fees and awarded $2,000 for "drafting a Complaint

and proceeding to judgment against PRC." The award was based on the court's view that

> [h]ad Plaintiffs sued PRC only, obtained a default and then proceed to judgment, the fees would have been substantially less. Much of the expenses incurred arose from efforts against Mr. Snitzer, who had been ousted or resigned months before the employment agreements were breached. There is no basis upon which to assess attorneys' fees for efforts against Mr. Snitzer.

Appellants filed a notice of appeal on March 16, 2012. They specifically appealed:

> the Motions Ruling dated January 15, 2011 holding for further determination a Motion for Sanctions (and never ruled upon), the Motions Ruling dated March 14, 2011 denying a Motion for Sanctions, the ruling of the Court rendered orally on November 15, 2011 dismissing Michel Snitzer from the case,[17] the Judgment of this Court rendered orally on November 15, 2011 dismissing the individual Defendants from the case and denying counsel fees and litigation costs, and the Order dated February 17, 2012 ruling on a post-judgment Motion to Alter, Amend or Revise Judgment.

Additional facts will be discussed below, as necessary.

## QUESTIONS PRESENTED

Appellants present five issues,[18] which we have recast and reworded:

---

**17.** Appellants present no argument in support of this point and thus have waived it on appeal. *See Klauenberg v. State,* 355 Md. 528, 552, 735 A.2d 1061 (1999) ("[A]rguments not presented in a brief or not presented with particularity will not be considered on appeal.").

**18.** Appellants ask us to consider:

> 1. The individual members of the Board of Directors of an unincorporated association should be held personally liable for the debts of the association if they did not perform their duties properly.

I. Whether the individual officers and directors of PRC, an unincorporated association, could be held personally liable for the association's breach of contract.

II. Whether the Maryland Wage Payment and Collection Act permits the award of treble damages, attorney's fees, and litigation costs against the PRC officers and directors.

III. Whether the circuit court erred in declining to award sanctions for a failure to attend a deposition and a failure to attend mediation.

We answer the first question in the affirmative and answer the second and third questions in the negative. We therefore reverse in part, affirm in part, and remand for further proceedings.

## STANDARD OF REVIEW

 Non-jury trials are reviewed on both the law and the evidence. Md. Rule 8–131(c). Legal conclusions, such as those reached in the interpretation of a contract, are reviewed *de novo*. *Sy–Lene of Wash., Inc. v. Starwood Urban Retail II*, 376 Md. 157, 163, 829 A.2d 540 (2003).

## DISCUSSION

### I. Individual Liability

Appellants argue that the individual officers and directors should be held liable for PRC's breach of contract. They

---

2. A party enforcing the Maryland Wage Payment and Collection Law should be awarded adequate and reasonable counsel fees, if the employer withheld wages not as a result of a bona fide dispute.

3. A party enforcing the Maryland Wage Payment and Collection Law should be awarded all of their necessary and reasonable litigation costs.

4. A. Monetary sanctions should be granted for the failure of counsel to notify opposing counsel that a scheduled deposition would not be held.
 B. Monetary sanctions should be granted when parties and their counsel fail to participate in a court-ordered mediation and a court-ordered Settlement Conference, especially when not notifying opposing counsel.

claim that there is little Maryland law on point, and they rely on case law from other states in support of their position that individual officers and directors of unincorporated associations are generally not exempt from personal liability for breaches of contract by the association.

Before we determine whether the officers could be liable, we believe it would be helpful to discuss the nature and legal status of an unincorporated association, both here and elsewhere. We then consider whether officers can ever be personally liable for an association's breach of contract.

## A. Unincorporated Associations in General

"Unincorporated associations long have been a problem for the law. They are analogous to partnerships, and yet not partnerships; analogous to corporations, and yet not corporations; analogous to joint tenancies, and yet not joint tenancies; analogous to mutual agencies, and yet not mutual agencies." *Cox v. Thee Evergreen Church*, 836 S.W.2d 167, 169 n. 3 (Tex.1992). Although there is no single dominant form of an unincorporated association, they are often defined as an "organization consisting of [two] or more members joined under an agreement that is oral, in a record, or implied from conduct, for one or more common, nonprofit purposes." Rev. Unif. Unincorporated Nonprofit Ass'n Act § 2(8), 6A U.L.A. 175 (2008, 2013 Supp.). The unincorporated association form is most often used for small local organizations, such as local clubs, charitable trusts, and political clubs, though labor and trade unions are also frequently unincorporated. *See* Howard L. Oleck & Martha E. Stewart, *Nonprofit Organizations, Corporations, and Associations* 146–47 (1994) (hereinafter Oleck & Stewart).

In this case, PRC had at least some formal organization, as it operated under a Constitution, Bylaws, and a Policy Manual. Membership in PRC was open to "[a]ll Baltimore County residents with an interest in the betterment of Recreation and Parks" and "[a]ll members of any program or organization affiliated with the Pikesville Recreation & Parks Council."

Under the Constitution and Bylaws, all members, including directors, were required to pay annual dues of $25 and attend at least half of the PRC meetings in a given year.

The Constitution and Bylaws govern the management of PRC and provide:

ARTICLE VI—OFFICERS

Section 1. The governing body of this organization shall be the Executive Board. The Board shall be composed of the following, President, Administrative Vice President, Operations Vice President, Secretary, Treasurer and two (2) members at large. All officers and at-large members shall be elected in April and take office in May.

 a. Each officer shall serve a two-year term. There are no term limitations.

 b. No officer shall hold more than one elected office at the same time.

 c. Anyone wishing to serve in a Council office or on the Executive Board shall have been active in the Council for one year, and shall have attended at least one meeting per quarter.

 d. To be eligible for the positions of President, either of the Vice Presidents, Secretary or Treasurer, the candidate must have served on the executive board for two years.

Section 2. The Executive Officers shall consist of President, both Vice Presidents, Secretary and Treasurer.

. . . .

ARTICLE VIII—COUNCIL ORGANIZATION

Section 1. All policies having to do with the operation of the Council shall be made at the regular Council meetings. Specifically the Council shall elect officers, adopt the budget, approve any increases in an allotment for an activity, approve any new type of program, grant affiliation to organizations, and amend the By–Laws.

Section 2. The Executive Board shall administer the Council business. The Board shall be composed of the following,

President, Administrative Vice President, Operations Vice President, Secretary, Treasurer and two (2) members at large.

The governing documents thus appear to draw a distinction between officers and at-large members. Yet the Bylaws also show that the individuals responsible for PRC's business, including program oversight, are all seven members of the Board. At the very least, five of the seven named positions are officers; arguably, all seven are officers. None of the six appellees have raised any legal objections regarding their status as officers. Thus, for the purposes of our analysis and the distinction between officers and members of an organization, discussed at pp. 571–72, 78 A.3d at 482–83, *infra,* we assume without deciding that the six individual appellees, as members of the Executive Board, were all officers of PRC.[19]

**B. Legal Rights and Duties**

Determining the legal status of unincorporated associations in Maryland raises some initial questions: Can they sue and be sued? Can they contract?

### 1. Sue and Be Sued

At common law, an unincorporated association was not a separate legal entity from its members. *See United Mine Workers of America v. Coronado Coal Co.,* 259 U.S. 344, 385, 42 S.Ct. 570, 66 L.Ed. 975 (1922); *Littleton v. Wells & McComas Council,* 98 Md. 453, 455, 56 A. 798 (1904); Restatement (Second) of Judgments § 61 cmt. a (1982). Because an unincorporated association had no legal existence, it could not contract, sue, or be sued.[20] *See, e.g., Lewis v. Tilton,* 64 Iowa 220, 19 N.W. 911, 912 (Iowa 1884); *Clark v. O'Rourke,* 111 Mich. 108, 69 N.W. 147, 148 (1896); *Fredendall v. Taylor,* 23

---

**19.** On remand, the parties may introduce evidence on the question and the circuit court is free to resolve any dispute of fact on the issue.

**20.** In Maryland, the members could sue in the organization's name, "as individuals having a common interest," but the organization could not sue on its own. *Mears v. Moulton,* 30 Md. 142, 146 (1869) (reviewing English cases).

Wis. 538, 540 (Wis.1868). Members generally could not sue the organization, either. *See Fiorita v. McCorkle,* 222 Md. 524, 528–29, 161 A.2d 456 (1960) (surveying cases).

Over time, however, as the number of unincorporated associations grew, many courts and legislatures decided that they should be treated as separate legal entities from their members.[21] *See, e.g., Coronado Coal Co.,* 259 U.S. at 391, 42 S.Ct. 570 (finding unincorporated labor unions to be "suable in the federal courts for their acts"); Restatement (Second) of Judgments § 61 cmt. b (1982); Oleck & Stewart, *supra,* at 150 (surveying state laws). *But see Clark v. Fitzgerald Water, Light & Bond Comm'n,* 284 Ga. 12, 663 S.E.2d 237, 238–39 (2008) (unincorporated associations may not sue or be sued unless authorized by statute); *Prime v. Beta Gamma Chapter of Pi Kappa Alpha,* 273 Kan. 828, 47 P.3d 402, 405 (2002) ("The rule in Kansas is that an unincorporated association can neither sue nor be sued . . . .").

At the beginning of the twentieth century, the Court of Appeals of Maryland held that unincorporated associations could sue and be sued in their own names. *Littleton,* 98 Md. at 456, 56 A. 798. The Court reached this conclusion in interpreting a provision of the State's corporation law, which at the time provided that "it shall be sufficient in any suit, pleading or process, either at law or in equity, or before any [J]ustice of the [P]eace, by or against any joint stock company or association, to describe the said joint stock company or association by the name or title by which it is commonly

---

**21.** Whether or not an unincorporated association should be treated as a separate legal entity was most frequently a concern in tort cases, especially where a member sought to sue the organization. *See, e.g., Marshall v. Int'l Longshore. & W.U., Local 6, Dist. 1,* 57 Cal.2d 781, 22 Cal.Rptr. 211, 371 P.2d 987, 991 (1962) (holding that union member could sue union in tort); *Crocker v. Barr,* 305 S.C. 406, 409 S.E.2d 368, 372 (1991) (holding that "an unincorporated association, regardless of its underlying purpose, is amenable to suit by its members for tortious acts"); *Cox,* 836 S.W.2d at 169 (holding that "member of an unincorporated charitable association should not be precluded from bringing a cause of action for negligence against the association solely because of the individual's membership in the association.").

known, or by or under which its business is transacted." *Id.* at 455, 56 A. 798 (quoting Chapter 471, Sec. 215, *Laws of 1868* (then codified at 1888 Code, Art. 23, Sec. 301)).

■ Maryland law still reflects the Court's conclusions in *Littleton:* an unincorporated association can sue and be sued, and a judgment against the association alone does not reach the assets of its members. *See* CJP § 6–406(a) (providing "sue or be sued" status); CJP § 11–105 (stating that a money judgment against an unincorporated association "is enforceable only against the assets of the group as an entity, but not against the assets of any member"). The "sue or be sued" provision has been a part of Maryland statutes since 1918, when the Legislature added it to the corporation statutes.[22] *See* Chapter 419, *Laws of 1918* (then codified at 1924 Code, Art. 23, Sec. 104). Individual members of unincorporated

---

22. The law provided that:

> Any unincorporated association or organization, consisting of seven or more persons and having a recognized group name, may sue or be sued by such name in any action affecting the common property, rights and liabilities of such association or organization; ... such action shall have the same force and effect, as regards the common property, rights and liabilities of such association or organization only, as if it were prosecuted by or against all the members thereof, and such action shall not abate by reason of the death, resignation, removal or legal incapacity of any officer or member of such association or organization, or by reason of any change in the membership thereof.

Chapter 419, *Laws of 1918.* The statute's emphasis on "the common property, rights and liabilities of such association or organization only" is arguably a precursor to the protection from judgments afforded to individual members afforded by the legislative predecessors to CJP § 11–105. Comments to the Restatement (Second) of Judgments § 61 (1982) appear to suggest that a statute like the 1918 legislation and its successors changes the common law to confer liability on the entity and "immunity" on the members. *See* cmts. a, b. Such a conclusion appears to ignore the text of the Maryland statute. Maryland's general law on unincorporated associations, unlike the Uniform Act, does not make it clear that individual members are immunized. *See* Rev. Unif. Unincorporated Nonprofit Ass'n Act § 8, 6A U.L.A. 175 (2008, 2013 Supp.). However, the General Assembly, in piecemeal fashion, has enacted a number of immunity provisions that could protect members of unincorporated associations established for specific purposes. *See* n. 43, *infra.*

associations later received explicit statutory protection from money judgments against the association in 1965. *See* Chapter 560, *Laws of 1965* (then codified at 1957 Code, 1966 Repl.Vol., Art. 23, Sec. 138) (providing that "[a]ny money judgment against such association . . . shall be enforceable only against such association . . . as an entity and against its assets, and shall not be enforceable against any individual member or shareholder or his assets.").[23]

### 2. Contracts

Although no law explicitly permits unincorporated associations to enter into contracts, a review of Maryland case law indicates that this is a long-recognized and uncontroversial power.[24] *See Miller v. Loyal Order of Moose Lodge No. 358*, 179 Md. 530, 536, 20 A.2d 156 (1941) (permitting unincorporated association to sue for breach of contract). *Cf. Schlosser v. Grand Lodge of Brotherhood of Railroad Trainmen*, 94 Md. 362, 364, 50 A. 1048 (1902) (dispute over unincorporated union's payment of contractual beneficiary benefits); *Snowden v. Crown Cork & Seal Co. of Baltimore City*, 114 Md. 650, 659, 80 A. 510 (1911) ("The power [of an unincorporated association] to sue in such a representative capacity presupposes the right to acquire and possess in the same capacity the interests which a suit might protect.").

---

**23.** There is no written legislative history on the 1965 statute. For this reason, it is unclear whether this law was intended to codify or confirm the existing common law or to confer greater protection for individual members than that available under *Littleton*, 98 Md. at 456, 56 A. 798. Although the dissent concludes that the statute "evidenced a legislative intent that the mere status of member or officer acting as an agent for a disclosed legally cognizable principal within the scope of agency would not serve as a basis for liability to creditors," we think this statement goes too far in its interpretation of the statute. *See* pp. 573–74, 78 A.3d at 484–85, *infra*.

**24.** According to the Restatement (Second) of Judgments, "the commonly adopted versions of 'joint debtor' and 'common name' statutes in effect accord associations entity treatment in contract and property transactions." Restatement (Second) of Judgments § 61 cmt. a. Under the Restatement, the 1918 legislative predecessor to CJP § 6–406 would be a "common name" statute.

### C. Individual Liability

Recognizing that unincorporated associations have the power to sue, be sued, and contract in Maryland, we next consider whether the individuals who make up those organizations could be exposed to liability for the association's actions. We first review the limited body of Maryland cases and statutes relevant to individual liability before turning to case law from other states for guidance on both the principles for liability and examples of their application.

We pause to clarify an important point: because the individual appellees all appear to be officers of PRC, rather than mere members, the following analysis applies only to those members of an organization who are charged with the organization's operations and decision-making, such as the officers and directors. Appellants do not argue that *all* of the members of PRC are liable for the breach of contract; instead, they focus on the organization's officers and directors. We similarly limit our inquiry to the members who are responsible for the operation of the organization.

### 1. Maryland Common Law and Statutory Modification

At common law, officers of an unincorporated association were personally liable for the debts of the association.[25] *See*

---

25. Prior to the enactment of statutes with regard to unincorporated associations, other states overwhelmingly shared this view of the common law. *See generally* R.S., Annotation, *Personal Liability of Member of Voluntary Association Not Organized for Personal Profit on Contract with Third Person*, 7 A.L.R. 222 (1920) ("The members of a voluntary association, not organized for profit, are jointly and severally liable as principals on contracts purporting to have been made by, for, or in the name of the association, when they have given either their assent or their subsequent ratification thereto.") (collecting cases). At least one state has enacted a statute providing for individual liability. For example, a California statute enacted in 1872 and still in effect in the early twentieth century stated that:

When two or more persons, associated in any business, transact such business under a common name, whether it comprises the names of such persons or not, the associates may be sued by such common name, the summons in such cases being served on one or more of the associates; and the judgment in the action shall bind the joint property of all the associates, and the individual property of the party

*Littleton,* 98 Md. at 455, 56 A. 798 ("An unincorporated society or association was regarded at common law as a partnership, so far as its rights and liabilities were concerned, and suits could not be maintained by or against it in the name of the society or association, but the members composing it were the proper parties."); *Miller,* 179 Md. at 536, 20 A.2d 156 (holding general manager and president of unincorporated association personally liable for association's breach of contract). *Cf. Laflin & Rand Powder Co. v. Sinsheimer,* 46 Md. 315, 321–22 (1877) (declining to permit recovery against individual members of corporation, over plaintiff's plea to treat them like members of unincorporated association); *Cranson v. Int'l Business Machines Corp.,* 234 Md. 477, 489, 200 A.2d 33 (1964) (declining to treat defectively incorporated business as unincorporated association and finding president not personally liable for business's breach of contract).[26]

■ Since the Court of Appeals' decision in *Littleton,* 98 Md. at 456, 56 A. 798, and the Legislature's subsequent enactment of the legislative predecessors to CJP § 11–105, a judgment rendered solely against an *association* does not, on its own, expose the association's officers to liability. Yet CJP § 11–105 does not address whether the officers, if named *personally,* can be held liable in actions also brought against the association. Similarly, CJP § 6–406 does not address the individual liability of officers: it simply permits unincorporated associations to sue or be sued and does not mention any changes to the rights and liabilities of individual officers.

Generally, statutes authorizing an association to sue and be sued are cumulative, meaning they do "not preclude a plaintiff

---

or parties served with process, in the same manner as if all had been named defendants and had been sued upon their joint liability. Cal.Civ.Proc.Code § 388 (Deering 1915) (cited in *Zimmerman v. Prior,* 46 Cal.App. 40, 188 P. 836, 837 (1920)).

**26.** The dissent argues that these cases support non-liability. We disagree. The Court of Appeals found that the individual defendants were not liable because of the protections the corporation statutes provided them—protections that are clearly not afforded to unincorporated associations. *See* n. 41, *infra.*

from pursuing his common law right to proceed against each individual member [27] of the association." *Shortlidge v. Gutoski*, 125 N.H. 510, 484 A.2d 1083, 1087–88 (1984) (citing *Fast v. Kahan*, 206 Kan. 682, 481 P.2d 958, 963 (1971); *Lyons v. Am. Legion Realty*, 172 Ohio St. 331, 175 N.E.2d 733, 736 (1961)); *see also Heleniak v. Blue Ridge Ins. Co.*, 162 A.D.2d 1041, 557 N.Y.S.2d 229, 230 (1990) (concluding that New York sue and be sued statute "did not create new substantive rights or liabilities; liability remains, as it was at common law, that of the members severally."); *Jenkinson v. Wysner*, 125 Mich. 89, 83 N.W. 1012, 1013 (1900) (concluding that Michigan sue and be sued statute is "merely cumulative [and] it does not take away the right to sue members of the association"). *See generally* D.C. Barrett, Annotation, *Suability of Individual Members of Unincorporated Association as Affected by Statute or Rule Permitting Association to be Sued as an Entity*, 92 A.L.R.2d 499 (1963) ("Except for a dictum in one case, no case has been found which has directly held that a statute or rule permitting an unincorporated association to be sued precludes an action against the individual members."). The Maryland Court of Appeals appears to have recognized this principle in *Littleton*, when it observed that "[t]he statute does not take away the right existing at common law to sue the members of an unincorporated association, but the creditor has the option to sue either the association or the members; and, when the suit is against the former, a judgment obtained can only affect its joint property." 98 Md. at 456, 56 A. 798.

We do not read *Littleton*, in embracing the common law rule, as positing an either/or system of recovery.[28]

■■ Similarly, we conclude that CJP § 6–406 is merely cumulative and does not eliminate potential liability for individual officers. Had the Legislature intended to eliminate

---

27. Although *Shortlidge* speaks generally of the liability of "members," 484 A.2d at 1087–88, we focus only on the liability of officers.

28. This conclusion is supported by at least one instance in Maryland caselaw of recovery against both an individual officer and an association. *See Lawson v. Clawson*, 177 Md. 333, 9 A.2d 755 (1939), discussed *infra*.

liability for individual officers entirely, it would have said so.[29] This conclusion is also in line with the presumption that "statutes in derogation of the common law are strictly construed," *Cosby v. Dep't of Human Resources*, 425 Md. 629, 645, 42 A.3d 596 (2012), and are "not presumed to repeal the common law further than is expressly declared," *Robinson v. State*, 353 Md. 683, 693, 728 A.2d 698 (1999) (Quotation omitted).

▌ Indeed, in the realm of tort law, individual officers and decision-making members can be held liable for torts committed within or by an unincorporated association. The Court of Appeals found two committee chairmen of an unincorporated association liable, in addition to the association, on a tort claim because they directed and planned the "all-star professional wrestling match" at which the plaintiff was injured.[30] *Lawson v. Clawson*, 177 Md. 333, 339–41, 9 A.2d 755 (1939). *See also Rubin v. Weissman*, 59 Md.App. 392, 406–07, 475 A.2d 1235 (1984) (observing that associations may be liable for the torts of individual members and vice versa). Generally speaking, officers and other agents of associations, such as PRC, are now statutorily protected from personal liability for "damages in any suit" if the association maintains insurance coverage. CJP § 5–406(b). It stands to reason that, absent such insurance coverage, personal liability could attach.[31]

---

**29.** The dissent concedes that this statute "could have been clearer." Given the lack of clarity as to an abrogation of the common law on personal liability of association members, the proper course is to recognize the continued force of the common law.

**30.** The dissent argues that *Lawson* is not on point because it applies "general tort principles that result in tort liability when an individual commits tortious acts." *See* dissent p. 598, 78 A.3d at 499, *infra*. Although the dissent correctly summarizes the Court of Appeals' reasoning, *see* 177 Md. at 341, 9 A.2d 755, it discounts the relevance of the case, in that it is one of only a handful of reported cases in Maryland to directly consider the personal liability of officers of an unincorporated association. Therefore, while we are mindful of the difference between torts and contracts as areas of law, we decline to disregard the usefulness of *Lawson* in the present inquiry.

**31.** The record does not disclose whether PRC had such insurance.

Maryland case law also indicates that officers can be held liable for their association's breach of contract.[32] In *Miller v. Loyal Order of Moose Lodge No. 358 of Moorefield, W. Va.,* 179 Md. at 531, 20 A.2d 156, a Moose Lodge entered into an "agreement [that] provided among other things that Miller Bros. Shows would exhibit in the town of Moorefield, West Virginia, for the Moose Labor Day Celebration." The contract was between the Moose Lodge and "Morris Miller, doing business under the name of Miller Bros. Shows," an unincorporated entity. *Id.* Miller Bros. failed to put on the show, and the Moose Lodge sued the president of Miller Bros., in his individual capacity, to recover contractual damages of $250. *Id.* at 532, 20 A.2d 156. The circuit court, after a bench trial, found the president personally liable for the breach of contract, *id.* at 532–33, 20 A.2d 156, and the Court of Appeals affirmed that finding, without explanation, *id.* at 536, 20 A.2d 156.

## 2. Personal Liability Generally

Because the Maryland cases and statutes demonstrate only that an officer *may* be liable for an association's breach of contract, we turn to the case law of other states for a better understanding of when officers are personally liable. Because the majority of states have not enacted comprehensive statutes on unincorporated associations,[33] the common law still

---

**32.** Other states have considered personal liability in more depth and have generally determined that, under the common law, officers can be personally liable for an association's breach of contract. *See generally* R.S., Annotation, *Personal Liability of Member of Voluntary Association Not Organized for Personal Profit on Contract with Third Person,* 7 A.L.R. 222 (1920); W.Q.F., Annotation, *Personal Liability of Member of Voluntary Association Not Organized for Personal Profit on Contract with Third Person,* 41 A.L.R. 754 (1926).

**33.** Fifteen states and the District of Columbia have adopted a version of the Unincorporated Nonprofit Association Act, which the Uniform Law Commission published in 1996 and revised in 2008. *See generally Unincorporated Nonprofit Association Act,* Uniform Law Commission, http://www.uniformlaws.org/Act.aspx?title=Unincorporated% 20Nonprofit% 20Association% 20Act% 20(2008). The 2008 Unincorporated Nonprofit Association Act eliminates individual liability, stating that

generally governs the principles of liability. Our inquiry focuses on (a) whether the association is for-profit or nonprofit, and (b) whether the allegedly liable individuals authorized, assented to or ratified the contract in question.

### a. For-profit vs. Nonprofit

 The gist of out-of-state cases is that individual liability depends in part on whether the association is organized for profit. *Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273, 1285 (5th Cir.1994). *See generally Ash v. Guie*, 97 Pa. 493, 499 (Pa.1881) (surveying British cases on profit versus nonprofit distinction in liability). Personal liability for members of for-profit or business organizations is analyzed under partnership principles, while individual liability in nonprofit associations is analyzed under agency principles. *Karl Rove & Co.*, 39 F.3d at 1284–85. Therefore, in nonprofit associations, "a member is personally responsible for a contract entered into by the nonprofit association only if—viewing him as though he were a principal and the association were his agent—that member authorized, assented to, or ratified the contract in question." [34]

"[a] debt, obligation, or other liability of an unincorporated nonprofit association, whether arising in contract, tort, or otherwise: (1) is solely the debt, obligation, or other liability of the association; and (2) does not become a debt, obligation, or other liability of a member or manager solely because the member acts as a member or the manager acts as a manager." Rev. Unif. Unincorporated Nonprofit Ass'n Act § 8(a), 6A U.L.A. 175 (2008, 2013 Supp.).

34. At common law, agency principles applied because unincorporated associations were not typically recognized as juridical entities, thereby making the member an "agent of a nonexistent principal" and "liable for the contract entered into on behalf of the nonexistent principal." *Karl Rove & Co.*, 39 F.3d at 1285; *see also Venus Lodge No. 62, F. & A.M. v. Acme Bene. Ass'n*, 231 N.C. 522, 58 S.E.2d 109, 112 (1950); *Cousin v. Taylor*, 115 Or. 472, 239 P. 96, 97 (1925); *Smith and Edwards v. Golden Spike Little League*, 577 P.2d 132, 134 (Utah 1978). Because many states, including Maryland, now recognize unincorporated associations as legal entities, "[o]ne could argue, therefore, that it is no longer necessary or even appropriate for the laws of these jurisdictions to permit third parties to sue individually the members of an association for the contract debts incurred by the association in its own name." *Karl Rove & Co.*, 39 F.3d at 1286. However, other states have declined to adopt this approach. *Id.* (collecting cases).

*Id.* at 1284, 1284 n. 38 (collecting cases). Because it is undisputed that PRC was a nonprofit association, we focus our discussion on cases addressing officer liability in nonprofit associations.

### b. Authorization/Assent/Ratification

■ An officer must be shown to have "authorized, assented to, or ratified the contract in question" in order to find him personally liable for the association's breach of contract. *Karl Rove & Co.*, 39 F.3d at 1284; *see also Vorachek v. Anderson,* 54 N.D. 891, 211 N.W. 984, 985 (1927) (establishing liability requires showing that an officer "has actually or constructively assented to or ratified the contract upon which the liability is predicated"); *Victory Committee v. Genesis Convention Center of City of Gary,* 597 N.E.2d 361, 364 (Ind.Ct.App.1992) (officers of a "not-for-profit unincorporated association are liable for the obligations incurred by the association under a contract if the [officers] authorize the contract or subsequently ratify its terms.") Because ratification, authorization, and assent can take many forms, we discuss below some cases where courts have found that ratification did or did not occur.

For example, the Fifth Circuit considered officer liability in the context of a contract dispute between an unincorporated political campaign committee and a company that provided direct mail fundraising services for the campaign. *Karl Rove & Co.*, 39 F.3d at 1276. After the candidate lost the election, his campaign committee failed to pay the company some of the money owed to it under the contract, and the company sued the committee, the candidate, and the treasurer for breach of contract. *Id.* Applying Pennsylvania and Texas law, the Fifth Circuit found that although the candidate was not named in the contract and did not sign it, he was capable of incurring personal liability for the committee's debts under the contract. *Id.* at 1291. The court next determined that the candidate was in fact liable because he assented to the contract: he knew that his campaign committee "would and did contract for direct mail fundraising services and [thus] approved, at least

tacitly, the [c]ommittee's decision to enter into" the contract. *Id.* at 1295.

In *Victory Committee v. Genesis Convention Center of City of Gary,* 597 N.E.2d at 363, a convention center brought a breach of contract action against a political candidate's reelection committee, the candidate, and the committee's treasurer, after the committee failed to pay the center after holding a fundraiser there. The contract was between the committee and the center and was signed by the committee's treasurer "in her capacity as treasurer." *Id.* In affirming the trial court's grant of summary judgment in favor of the convention center, the Court of Appeals of Indiana held that the candidate and the committee treasurer were personally liable because they approved the contract, in different ways: the treasurer negotiated the contract and signed it for the committee, while the candidate failed to assert, in his affidavit, any facts showing that the committee "was not authorized to enter into the agreement, or that he disavowed this particular contract, or that he did not indeed reap the benefits of the fundraiser held to support his re-election campaign." *Id.* at 365.

An individual's ratification of the contract typically amounts to liability, absent contract terms to the contrary. In *Shortlidge v. Gutoski,* 125 N.H. 510, 484 A.2d 1083, 1085 (1984), the New Hampshire Supreme Court considered whether the vice president of an unincorporated taxpayers association was personally liable for the association's failure to pay for legal services. The vice president had, on behalf of the association, contracted with the plaintiff, who sued only the vice president when he failed to receive full payment for his services. *Id.* Observing that this was an issue of first impression in New Hampshire, the court applied the common law principle of liability for "members ... who have authorized, assented to, or ratified the underlying transaction and thereby have become liable for the association's debts." *Id.* at 1086. The court remanded the case for further fact-finding on the exact terms of the contract, which was apparently an oral agreement. *Id.* at 1086. The court observed, however, that absent

any evidence that the plaintiff agreed "to look exclusively to the funds expected to be raised by the taxpayers association for his compensation and not to the personal funds of the defendant or any other member of the association," it "would find the defendant personally liable" because he "assented to and ratified the plaintiff's employment contract." [35] *Id.* at 1086–87 (Internal quotations omitted).

■ If an officer clearly disapproves of the contract, liability will not attach. For example, in *Will v. View Place Civic Ass'n*, 61 Ohio Misc.2d 476, 580 N.E.2d 87, 92 (Ohio Ct.Com. Pl.1989), the trial court declined to enforce a contract against two members of an unincorporated association. The court determined that the members were not officers, and they had manifested an intent not to be bound by the contract, including writing letters and renouncing their membership in the association. *Id.* However, the decision to not ratify an action must be clear. In *Fed. Deposit Ins. Corp. v. Tyree*, 698 S.W.2d 353, 354 (Tenn.Ct.App.1985), the chairman of the nonprofit campaign committee "Tennesseans for Tyree" signed two promissory notes on behalf of the committee. The Federal Deposit Insurance Corporation ("FDIC") later sought to collect on the notes and sued the candidate and the committee chairman, among others. *Id.* The Court of Appeals of Tennessee reversed the grant of summary judgment to the candidate and chairman because there were disputed issues of material fact as to whether the candidate and the chairman had authorized the promissory note transactions and ratified the subsequent loans. *Id.* at 357.

Our research has revealed only a few out-of-state cases where officers of an unincorporated association were found to not be personally liable for the association's breach of contract

---

**35.** We note that the conclusion reached in *Shortlidge* relies at least in part on a legal foundation that does not exist in Maryland. In *Shortlidge*, the court reached its conclusion regarding liability in part because in New Hampshire, the association "was in actuality not a legal entity having the power to contract" 484 A.2d at 1087. The opposite is true in Maryland: unincorporated associations *do* have the power to contract. *See Snowden*, 114 Md. at 659, 80 A. 510.

despite evidence of ratification of the contract. These cases tend to rely on the theory that the individual defendants had not made any personal promise to be liable on the contract.[36] *See, e.g., Little Rock Furniture Mfg. Co. v. Kavanaugh,* 111 Ark. 575, 164 S.W. 289 (1914);[37] *Empire City Job Print v. Harbord,* 244 A.D. 6, 277 N.Y.S. 795, 796–97 (1935) (no personal liability for "active members" of unincorporated association

---

**36.** For example, the Fifth Circuit rejected an attempt to hold the president and other members of an unincorporated association personally liable for the association's breach of contract in *Austin–W. Rd. Mach. Co. v. Veal,* 115 F.2d 112, 113 (5th Cir.1940). The contract named the association and was signed by the president, although the court observed that the plaintiff "offered no minutes, resolutions or other proof showing that the contract was the contract of the organization." *Id.* Regarding the plaintiff's argument that the president should be personally liable because he signed the contract, the court observed that he "did not sign the contract personally or personally promise to pay. He signed it officially and officially only." *Id.* The court concluded by noting that "[p]laintiff did not sue [the president] as an agent for a principal, liable because he had assumed to bind his principal but failed to do so, it sued him as the contractor. Its proof showed that [the president] signed the contract sued on not as contractor and for himself, but as president of a disclosed principal." *Id.* at 113–14. The court's attachment of meaning to this difference is puzzling given that it contradicts the conventional common law principle that members or unincorporated associations are "jointly and severally liable as principals on contracts purporting to have been made by, for, or in the name of the association, when they have given either their assent or subsequent ratification thereto." R.S., Annotation, *Personal Liability of Member of Voluntary Association Not Organized for Personal Profit on Contract with Third Person,* 7 A.L.R. 222 (1920); *see also* W.Q.F., Annotation, *Personal Liability of Member of Voluntary Association Not Organized for Personal Profit on Contract with Third Person,* 41 A.L.R. 754 (1926).

**37.** *Little Rock Furniture Mfg. Co.* involved a suit for breach of contract against the chairman and other members of the executive committee of an unincorporated association. The association had entered into a contract, under its own name, but signed by the chairman, and failed to pay the full amount due under the contract. 164 S.W. at 290. The Supreme Court of Arkansas found that the chairman and other executive committee members, the appellees, were not liable for the debt because there was no evidence that the creditors had "any reasonable right to expect appellees to assume any personal liability to them, or to any one else" and because "the appellees were acting in a capacity known to all persons who dealt with them, and were chargeable with no higher duty to any creditor than to see that the funds were honestly accounted for and equitably disbursed." *Id.* at 294.

that was sued for breach of contract because it was "manifest from [the plaintiff's] testimony that he extended credit to the committee," not to the individual members). The dissent would rely on this line of cases to find no personal promise to pay—an approach seemingly at odds with the common law regarding ratification.[38]

Finally, *Stone v. Guth,* 232 Mo.App. 217, 102 S.W.2d 738 (1937), provides a good example of the rule we apply today, *viz.*, officers of nonprofit unincorporated associations are personally liable if they ratify the contract. Members of the Associated Electrical Contractors, Inc., which "purported to be a corporation, but was never incorporated," employed the plaintiff as a business manager for the association's publication. *Id.* at 739. The plaintiff sued the members, most of whom were not officers or directors, for $1,050 in unpaid wages, and the trial court dismissed the case against the defendants. *Id.* The Missouri Court of Appeals affirmed. *Id.* at 742. The court reached this decision by first considering whether the association was a for-profit or nonprofit organization and concluding that it was a nonprofit. *Id.* at 740–41. It also focused on whether the defendant members "participated in or authorized the transaction upon which liability is predicated." *Id.* at 741. The court determined that the defendants did not participate in the decision to hire the plaintiff, and because they were not involved, they were not liable. *Id.* Indeed, in the court's view, one defendant was "a mere

---

38. The dissent also cites *Krall v. Light,* 240 Mo.App. 480, 210 S.W.2d 739 (1948), which involved a breach of contract action brought by an unincorporated association. Because the defendant challenged the association's legal status, the court considered whether the individual members who made up the association could sue for the breach of contract. *Id.* at 744–45. After summarizing the principles of individual liability, including the fact that "[a]n officer who signs a contract for an association as a disclosed principal is not liable thereon, as an officer, absent a personal promise or circumstances establishing such an agreement …; but a member of the association who signs a contract, together will all other members who signed, or authorized, or ratified the signing of the contract are liable," the court found that the contract was binding on all association "members who ratified or authorized the contract." *Id.* at 745. We find that this analysis supports the view of the majority here.

nonparticipating member of the association" and "had nothing to do with the employment of the plaintiff." *Id.* at 742. Even the president of the association was not liable because "it [was] not shown that he participated in any way in the management or supervision of the affairs of the association, or that he had anything to do with the employment of the plaintiff or the publication." *Id.* The court concluded:

> It is not the law that a mere non-participating member of an unincorporated association, not organized for the purpose of engaging in business for profit, is individually liable for whatever debts may be incurred in the name of the association. If such were the law, no person of any financial responsibility would want to take the risk of becoming a member of such an association.[39]

*Id.*

### 3. Appellees' Liability

▆▆▆▆ The circuit court did not ground personal liability on a showing that the individuals were officers who authorized, assented to, or ratified the contract. Thus, the court erred and a remand is in order for the circuit court to apply this legal principle. This case would also benefit from additional factfinding on several matters. For example, at no point did appellees testify about whether they authorized, assented to, or ratified the employment contracts.[40] Although an unincor-

---

**39.** Although the liability of members is beyond the scope of this opinion, *see* p. 571, 78 A.3d at 482–83, *supra,* we find instructive the cogent view of some out-of-state courts that members of a non-profit association with minimal involvement would generally escape liability. *See, e.g., Vorachek,* 211 N.W. at 985 ("Membership, as such, imposes no personal liability for the debts of the association...."). This would include the mere payment of dues.

**40.** Comment a of § 61 of the Restatement (Second) of Judgments (1982) posits this assessment of the evidentiary burden of showing ratification under the common law:

> In property and contract cases, the transaction on behalf of the association is ordinarily conducted by its officers or sometimes, in the case of property transactions, by a trustee. Specific authority or ratification can be inferred from the association's articles of organiza-

porated association lacks the legal protections of the corporate form,[41] under the test we believe should apply, it must be shown that appellees authorized, assented to or ratified the contract before finding that they are personally liable for its breach. Whether there was a specific motivation for the breach, as appellants argued before the circuit court in advancing a fraud theory,[42] is irrelevant to this inquiry. Fur-

---

tion, whether formal or informal, or from the members' acceptance of the benefits of the transaction, or from other manifestations. The effect is to bind all the members to the transaction, with corresponding liability for obligations arising from it.

41. If PRC were incorporated, it is unlikely that there would be any personal liability for its members, as Maryland courts will pierce the corporate veil and attach liability to individual officers "only when necessary to prevent fraud or to enforce a paramount equity." *See Bart Arconti & Sons, Inc. v. Ames–Ennis, Inc.*, 275 Md. 295, 312, 340 A.2d 225 (1975). The problem for unincorporated associations, however, is that there simply is no corporate veil behind which to hide. The unincorporated form does not, on its own, protect officers, and usually those officers are simply not aware of their potential liability. *See, e.g., Littleton*, 98 Md. at 456, 56 A. 798 ("The personal liability is ordinarily sufficient to induce members of such societies or associations to become incorporated, as in some cases the failure to do so might result in serious consequences to the members; and even if they be not liable as partners *inter sese*, ... they may be responsible to creditors."). We are not unaware of the harshness of the common law here; indeed, modern courts faced with similar cases have remarked upon the apparent unfairness of the situation. The Fifth Circuit, in finding personal liability for the political candidate in *Karl Rove & Co.*, observed that "the application of the law governing the liability of members for the debts of their unincorporated nonprofit association may sometimes lead to harsh or even subjectively unintended results. In fact, one commentator has ventured that the choice of this form of organization 'usually results from sheer ignorance of the possible degree of personal liability of its members.' " 39 F.3d at 1294 (quoting Oleck & Stewart, *supra*, at 144). The present case illustrates some unintended and seemingly harsh consequences of the common law rule: those closest to the employment decision, Michael and Sandy Snitzer, were properly dismissed as parties because they were not part of PRC when the breach of contract occurred. By contrast, those who possibly may have less of a connection to the employment decision may be subject to potential liability.

42. In their brief, appellants rely on *Parish v. Maryland & Virginia Milk Producers Ass'n*, 250 Md. 24, 74–75, 242 A.2d 512 (1968), and appear to suggest that the business judgment rule does not protect appellees from liability. Appellants are correct. However, we note that at no point

ther, to the extent that the circuit court deems it necessary, the court may wish to consider the application of immunity statutes that may possibly be relevant to the resolution of this case but were not presented at the first trial.[43]

We therefore reverse the circuit court's finding of no contractual liability for the individual appellees for the approximately $9,500 in unpaid wages and we remand for further proceedings.

---

did the officers invoke the business judgment rule. In addition, in our view, the business judgment rule applies to some, but not all, decisions of directors of unincorporated associations. *See N.A.A.C.P. v. Golding,* 342 Md. 663, 678, 679 A.2d 554 (1996) (suggesting that courts' reluctance to interfere in "internal disputes of unincorporated associations absent fraud is in essence analogous to the business judgment rule"). The business judgment rule applies when shareholders challenge directors' "internal management" decisions. *Parish,* 250 Md. at 74, 242 A.2d 512. Neither Pinsky nor Burman are known to be "shareholders" or even members of PRC, nor could PRC's decision to breach their employment contract be described as an internal management decision. This Court has apparently applied the business judgment rule to an employment decision once before, in *Edenbaum v. Schwarcz–Osztreicherne,* 165 Md.App. 233, 252–53, 885 A.2d 365 (2005), but there it was in the context of a small two-person corporation, where one director-shareholder was an employee and the other director-shareholder was the employer. Arguably, the Court's decision to speak in terms of the business judgment rule related more to the employee's challenge of the decision as a *shareholder* rather than as an employee. Thus, in this case, even if appellees clearly invoked the business judgment rule— which they did not—it is unlikely that it would protect them from a court's inquiry into the circumstances surrounding the breach of this employment contract.

43. Before the circuit court, appellees argued that CJP § 5–406, which limits personal liability of agents of certain types of organizations if the organization carries insurance coverage, applied and immunized appellees from liability. The court apparently did not make any rulings on this statutory question, and neither party has argued for or against its application on appeal. We note, however, that two other statutes, CJP § 5–407 and CJP § 5–802, may be relevant to any further resolution of this case. Both statutes limit personal liability for volunteers of certain organizations: CJP § 5–407 applies to charitable organizations, and CJP § 5–802 applies to community recreation programs. However, whether the statutes apply to actions in tort, contract, or both, is not entirely clear.

## II. Maryland Wage Payment and Collection Law

 Appellants obtained a judgment against PRC for treble damages, attorney's fees, and costs under the Maryland Wage Payment and Collection Act ("Payment and Collection Act"), LE § 3–507.1(b) (now LE § 3–507.2(b)).[44] On appeal, they seek additional attorney's fees and costs, as well as the award of treble damages against the individual appellees. However, in relying on LE § 3–507.2(b), the circuit court considered its application only as against PRC, not the individual defendants. Because the question of whether a defendant is an "employer" under LE § 3–507.2(b) is a condition precedent to an action for treble damages, attorney's fees, and litigation costs under the statute, we must first consider whether the individual officers and directors could be subjected to such liability.

 An "employer" is defined as "any person who employs an individual in the State or a successor of the person." LE § 3–501(b). Whether or not a given person or entity is an employer under the Payment and Collection Act is governed by the "economic reality" test. *Campusano v. Lusitano Const. LLC,* 208 Md.App. 29, 38, 56 A.3d 303 (2012). The economic reality test for an alleged employer's "control" over an employee examines "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id.* at 39–40, 56 A.3d 303 (quoting *Newell v. Runnels,* 407 Md. 578, 651, 967 A.2d 729 (2009)).

In their complaint, appellants alleged that PRC "entered into separate Employment Agreements with each of the Plaintiffs." Their allegations regarding the individual defendants

---

44. LE § 3–507.2(b) provides that if "a court finds that an employer withheld the wage of an employee in violation of this subtitle and not as a result of a bona fide dispute, the court may award the employee an amount not exceeding 3 times the wage, and reasonable counsel fees and other costs."

were limited to: (1) naming them as members of the Board of Directors and (2) stating that the defendants "wrongfully and materially breach[ed] the aforesaid Employment Agreements by failing and refusing to pay the Plaintiffs their compensation in full." At trial, appellants did not present any evidence showing that the officers met any of the factors of the "economic reality" test, such as supervisory power over the pre-school teachers or power to determine the rate and method of payment. Because we find that appellees do not qualify as employers under the Payment and Collection Act,[45] the statute's damages provisions do not apply to them.[46]

Appellants also seek the imposition of additional attorney's fees and costs. The court awarded $2,000 in attorney's fees for "drafting a Complaint and proceeding to judgment against PRC" and "$200.00 in reasonable and necessary costs." LE § 3–507.2 is a fee-shifting statute which "permit[s] a trial court, in its discretion, to award attorneys' fees, and such discretion, consistent with the intent of the General Assembly, is to be exercised liberally in favor of awarding fees, at least in appropriate cases." *Friolo v. Frankel,* 403 Md. 443, 456–57, 942 A.2d 1242 (2008) (Quotations omitted). Because the individual appellees are not "employers" under the Payment and Collection Act, they are not subject to the award of attorney's fees and costs. We therefore find no abuse of discretion in the court's modest award of fees and costs for a wage collection action and default judgment against PRC alone.

---

**45.** The dissent emphasizes this conclusion in support of its point that "the individual appellees were acting as agents of the association, not as principals to the contracts." *See* dissent p. 596, 78 A.3d at 498, *infra.* Whether appellees are "employers" under the Payment and Collection Act, has no bearing on our analysis pursuant to the different standards for contractual liability under the common law governing unincorporated associations.

**46.** However, we do not need to discuss whether PRC was an "employer" under LE § 3–507.2(b) because it did not cross-appeal the circuit court's ruling.

### III. Sanctions

■ Finally, appellants argue that the circuit court erred in not awarding sanctions against appellees' counsel for (1) failing to notify appellants' counsel that Engorn, the former PRC treasurer, would not attend a scheduled deposition, and (2) failing to participate in court-ordered mediation. When ruling on discovery disputes and determining if sanctions should be imposed, trial courts exercise "very broad discretion" that is reversed on appeal only in the presence of an abuse of that discretion. *North River Ins. Co. v. Mayor and City Council of Baltimore*, 343 Md. 34, 47, 680 A.2d 480 (1996).

■ Appellants' first challenge, regarding sanctions for the deposition, may not be properly before us because the circuit court never expressly ruled on the motion. *See* Md. Rule 8–131(a). In addition, because the deposition eventually took place four months later, in February 2011, appellants were not deprived of the discovery material they sought through the deposition. Thus, the circuit court would not have abused its discretion even if it had expressly denied the sanctions motion. Appellants' second challenge, regarding sanctions for mediation, also fails. Appellants sought sanctions in the amount of their respective daily wages and counsel fees. The court denied the motion in a written order and stated that it "kn[e]w of no authority that would allow [it] to enter sanctions against anyone for the failure to attend mediation." We find no abuse of discretion here. While a court has the discretion to enter sanctions, including, for example, sanctions that amount to default judgment, *see Station Maintenance Solutions, Inc. v. Two Farms, Inc.*, 209 Md.App. 464, 486, 60 A.3d 72 (2013), its inherent discretion never requires it to do so. Indeed, a court may not award sanctions as an effort to "shift litigation expenses based on relative fault," which seems to be exactly what appellants seek here. *See Tobin v. Marriott Hotels, Inc.*, 111 Md.App. 566, 575–76, 683 A.2d 784 (1996) (Quotation omitted). We therefore find no abuse of discretion.

For all of these reasons we affirm in part and reverse in part the judgment of the circuit court and remand for further proceedings.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED IN PART AND REVERSED IN PART. COSTS TO BE DIVIDED ON THE FOLLOWING BASIS: TWO-THIRDS TO BE PAID BY APPELLANTS, ONE-THIRD TO BE PAID BY APPELLEES. CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.**

Dissenting opinion by EYLER, JAMES R., J.

JAMES R. EYLER, J., dissenting.

I respectfully disagree with the conclusion reached by the majority with respect to question I, whether the individual defendants/appellees are liable. I agree with the conclusions reached by the majority with respect to question II, the applicability of the Wage Payment and Collection Law, and question III, the refusal to award sanctions.

At the outset, it is important to focus on what is before us so that it can be distinguished from what is not before us. During the relevant time period, the Pikesville Recreation Council ("PRC") was a nonprofit unincorporated association which offered recreational services to youths in the Pikesville area. PRC was structured; it had a constitution, bylaws, and a policy manual. PRC was engaged in community recreational activities and was recognized by the Baltimore County Department of Recreation and Parks. Membership in the PRC was open to all County residents who volunteered and who had an interest in encouraging recreational activities by youths.

PRC was not a partnership, joint venture, or business association in which the members participated for business or pecuniary reasons. The majority recognizes that whether an unincorporated association is nonprofit is relevant, but I conclude that the nature of the nonprofit entity is also relevant. Importantly, PRC was a nonprofit entity in which the mem-

bers (including officers and board members) participated for the public good, not for their personal gain or to further an agenda personal to them, such as the promotion of a political candidate, a religion, or a "cause." PRC was not a labor union, social club, religious association, or political action committee. PRC was a structured entity with many members; it was not a de facto sole proprietorship. The individual appellees were unpaid volunteers. I make these points because it serves to distinguish many of the cases upholding personal liability of officers or members.

The cause of action at issue is breach of contract. There is no claim of fraud, bad faith, or any other tort.

The circuit court ruled that the individual appellees were not liable as a matter of law. I conclude that the circuit court was correct based on (1) the effect of Maryland statutes, and (2) in the alternative, application of the following contract and agency principles.

Under general principles of agency and contract, an agent acting within the scope of agency for a disclosed principal is not liable on a contract entered into on behalf of the principal, but the principal is liable on that contract. *Walton v. Mariner Health of Maryland, Inc.*, 391 Md. 643, 655–656, 894 A.2d 584 (2006). As discussed by the majority, at common law, unincorporated associations were not legal entities and could not sue and be sued. Thus, a member of such an association could not bind the association because the association was a nonentity. As a result, through application of the principles of agency, the law regarded all members as being agents of each other, *i.e.*, each member was a co-principal and co-agent. Without that conclusion, there would have been no person or other entity to be held responsible for breach of any contract entered into by an unincorporated association.

In 1904, the Court of Appeals, interpreting a statute that had been enacted in 1868, chapter 471, § 215, *Laws of 1868* (codified at 1888 Code, Art. 23, § 301), held that creditors could sue and serve process on an unincorporated association. As noted by the majority, the Court also observed that

creditors could sue the association's members. It is unclear whether creditors could sue both or sue in the alternative. The opinion is silent on that point. *Littleton v. Wells & McComas Council,* 98 Md. 453, 455, 56 A. 798 (1904). In a suit against an unincorporated association, a judgment affected only its common property. *Id.* at 456, 56 A. 798.

In 1918, the General Assembly enacted Chapter 419, § 88–I, *Laws of 1918,* quoted at pages 569–70, 78 A.3d at 482 of the majority opinion. In pertinent part, the statute provided that an unincorporated association could sue or be sued in its name "in any action affecting the common property, rights and liabilities of such association or organization; . . . such action shall have the same force and effect, as regards the common property, rights and liabilities of such association or organization only, as if it were prosecuted by or against all the members thereof. . . ." It also provided that an action would not abate by reason of a change in the membership. This statute, without material change, appeared at Md.Code (1924), Art. 23, § 104, Md.Code (1939), Art. 23, § 123, and Md.Code (1951), Art. 23, § 138.

In 1965, the General Assembly enacted Chapter 561, *Laws of 1965,* which, in my view, either clarified the General Assembly's original intent, as expressed in 1918, or changed the law. The following language was added as the last sentence in the section.

Any money judgment against such association or joint stock company shall be enforceable only against such association or joint stock company as an entity and against its assets, and shall not be enforceable against any individual member or shareholder or his assets.

Prior to the 1965 amendment, the statute provided that any action against an unincorporated association affected only the common property and liabilities. While admittedly the amendment could have been clearer, there was no need to add the sentence quoted above if it was intended only to provide that a creditor could sue an association and reach the association's common property without suing the association's members. That was already stated. In my view, the amendment

evidenced a legislative intent that the mere status of member or officer acting as an agent for a disclosed legally cognizable principal within the scope of agency would not serve as a basis for liability to creditors.[1]

I reach the same conclusion on an alternative ground. The majority relies on cases in which courts applied principles of agency but comes to an erroneous conclusion on the facts before us. As noted above, at common law, before unincorporated associations were recognized as legal entities, courts applied agency principles. I recognize that some courts have continued to do that, in the absence of an applicable statute or rule, in states that do recognize unincorporated associations as legal entities. Courts that apply those principles in a state which recognizes an unincorporated association as a legal entity regard the association as the agent and the individual member or officer as the principal. *See, e.g., Karl Rove & Co.*

---

1. In 1975, by virtue of Chapter 378, § 2, *Laws of 1975*, Art. 23, § 138 was repealed and its provisions were split and re-enacted as §§ 6–406 and 11–105, now appearing at Md.Code (1974, 2013 Repl.Vol.), Courts and Judicial Proceedings Article ("CJP"). Section 6–406 appears under the heading of "personal jurisdiction, venue, process and practice" (Title 6), and under the subheading of "practice, in general." (Subtitle 4). Section 11–105 appears under the heading of "judgments" (Title 11), and under the subheading of "miscellaneous." (Subtitle 1). CJP § 6–406 provides:

 (a) An unincorporated association, joint stock company, or other group which has a recognized group name may sue or be sued in the group name on any cause of action affecting the common property, rights, and liabilities of the group.
 (b) An action under this section:
 (1) Has the same force and effect with respect to the common property, rights, and liabilities of the group as if all members of the group were joined; and
 (2) Does not abate because of any change of membership in the group or its dissolution.
 Section 11–105 provides:
 In any cause of action affecting the common property, rights, and liabilities of an unincorporated association, joint stock company, or other group which has a recognized group name, a money judgment against the group is enforceable only against the assets of the group as an entity, but not against the assets of any member.
 As is apparent, § 6–406 states that the action affects the common property, rights and liabilities of the group, without the need for what is now § 11–105.

*v. Thornburgh*, 39 F.3d 1273 (5th Cir.1994) (applying Texas and Pennsylvania law). I do not quarrel with that approach in this case. I disagree with the result when it is applied to the facts before us. When the nonprofit association exists for the benefit of the members, such as political action committees, or when the members form an unincorporated association to pursue action for their own benefit, the association may be acting on behalf of each member in attaining those goals. When a nonprofit unincorporated association exists to aid the public and not the members, as a matter of fact, the member is acting on behalf of the association, the latter being the principal.

Even the cases concluding that the individual member in question was liable as a principal recognize that the individual would not have been held liable if the individual had expressly indicated an intention not to be liable. *See Karl Rove & Co.*, 39 F.3d at 1295; *Will v. View Place Civic Ass'n*, 61 Ohio Misc.2d 476, 484, 580 N.E.2d 87 (Ohio Ct.Com.Pl.1989); *Shortlidge v. Gutoski*, 125 N.H. 510, 484 A.2d 1083, 1085 (1984) (court observed that individual members would not have been liable if the evidence had indicated that the plaintiff had agreed to look only to the funds of the association). Here, PRC was a large organization with many members and a structured existence. The employment agreements clearly stated that appellants were employed by PRC and PRC was responsible for payment. Among other provisions, the agreements provided that PRC "shall pay the employee," PRC "hires the employee," the employee "will devote full time, attention, and energies to the business of" PRC, PRC "shall reimburse Employee for all business expenses," and contractual remedies for breach belonged to PRC. There is no evidence, documentary or testimonial, that appellants believed the individual appellees would be liable for their wages.

The majority acknowledge that the Rev. Unif. Unincorporated Nonprofit Ass'n Act, § 8, 6A, U.L.A. 175 (2008, 2013 Supp.), makes it "clear that individual members are immunized." Majority opinion, page 572, fn. 22, 78 A.3d at 483–84, fn. 22. Under the Uniform Act the liability of a nonprofit

unincorporated association does not become a debt of a "member or manager solely because the member acts as a member or the manager acts as a manager." In my view, the proper application of the principles of agency will produce, in essence, the same result.[2] If a member, factually, is acting as a principal and the association as the member's agent, the member may be liable under general agency/contract principles. Unlike the days when an unincorporated association was not a legal entity, members are not presumed to be co-agents and co-principals. It is a question of fact. Here, the individual appellees were acting as agents of the association, not as principals to the contracts. See the discussion at part II, majority opinion, in which the majority concludes that the individual appellees were not the employers of the appellants.

The majority rely heavily on *Miller v. Loyal Order of Moose Lodge No. 358*, 179 Md. 530, 20 A.2d 156 (1941). The Lodge entered into an agreement with Morris Miller, doing business as Miller Bros. Shows, pursuant to which Miller Bros. Shows was to provide a certain exhibit for a Labor Day celebration. The contract was executed on behalf of the Miller entity as follows: "Miller Bros. Inc, By Wm. C. Murray, Gen. Agt., Party of the first part." Miller Bros. Shows did not perform under the contract, and the Lodge filed suit against Maurice Miller individually. *Id.* at 531, 20 A.2d 156. At trial, a judgment was entered in favor of the Lodge.

Maurice Miller testified that Miller Bros. Shows was not incorporated and that he took over operation of the shows after his father, Morris Miller, died. Morris Miller died prior to execution of the contract with the Lodge. Maurice Miller testified that "for all practical purposes at the time of the signing of the contract in this case and ever since, he had been Miller Bros. Shows." *Id.* at 534, 20 A.2d 156. Maurice Miller acknowledged that Wm. C. Murray was his agent. *Id.* at 532, 20 A.2d 156.

---

2. In 1995, Texas enacted the Uniform Unincorporated Nonprofit Association Act. In *MT Falkin Investments, LLC v. Chisholm Trail Elks*, 400 S.W.3d 658 (Tex.App.2013), the court, citing the statute, reached a result contrary to that reached in *Karl Rove & Co.*

On appeal, Maurice Miller contended (1) there was no legally sufficient evidence that he had approved the contract and (2) the Lodge lacked capacity to bring suit. *Id.* at 535, 20 A.2d 156. The Court, in concluding that there was sufficient evidence to find that Maurice Miller had approved the contract, stated: "The fact that the appellant testified that Murray negotiated agreements as a general agent for the firm, that appellant testified that he was the show, and Murray by letter notified the [the Moose Lodge] that he had talked over long distance with the boss and 'everything is Okay' " *Id.* With respect to the second issue, the Court stated that the Moose Lodge, an unincorporated association, could sue and be sued in its own name, quoting Flack's Code [1939], Art. 23, § 123. *Id.*

As is apparent from the above, Miller functioned as a sole proprietorship, and Miller Bros. Shows was not held out to the Lodge as an unincorporated association. There was no issue as to liability of the Lodge, which was an unincorporated association. Moreover, *Miller* was decided in 1941, before the 1965 statutory amendment, discussed above.

Several cases purporting to support contractual liability of individual members of an unincorporated association were decided when, under the applicable law, unincorporated associations were not recognized as legal entities. *See, e.g., Shortlidge v. Gutoski,* 125 N.H. 510, 484 A.2d 1083 (1984); *Vorachek v. Anderson,* 54 N.D. 891, 211 N.W. 984 (1927); *Medlin v. Ebenezer Methodist Church,* 132 S.C. 498, 129 S.E. 830 (1925); *Cousin v. Taylor,* 115 Or. 472, 239 P. 96 (1925); *Fast v. Kahan,* 206 Kan. 682, 481 P.2d 958 (1971). In some cases, the issue is not discussed, and the time consuming task of researching the statutes in those jurisdictions is required. In at least one case finding liability of individual members of an unincorporated association, the action against individual members was expressly permitted by a statute or judicial rule of procedure.[3] *Zimmerman v. Prior,* 46 Cal.App. 40, 188 P. 836

---

3. It is not clear whether the referenced section was a statute or procedural rule.

(1920). In many cases decided after unincorporated associations were recognized as legal entities in the relevant jurisdiction, the association was acting for and on behalf of the individual member. *See, e.g., Karl Rove & Co., supra; Victory Committee v. Genesis Convention Center of City of Gary*, 597 N.E.2d 361 (Ind.Ct.App.1992). I do not quarrel with the result in those cases on their facts.

I agree with the cases cited at pages 579–81, 78 A.3d at 487–89 of the majority opinion, *i.e., Little Rock Furniture Mfg. Co. v. Kavanaugh*, 111 Ark. 575, 164 S.W. 289 (1914) (no liability when there was no evidence that plaintiff had a right to expect that officers would be personally liable and knew that they were acting in a representative capacity); *Austin–W. Rd. Mach. Co. v. Veal*, 115 F.2d 112, 113 (5th Cir.1940) (same); *Empire City Job Print v. Harbord*, 244 A.D. 6, 277 N.Y.S. 795 (1935) (no liability when plaintiff has knowledge that individual members of unincorporated association did not extend personal credit). *See also Krall v. Light*, 240 Mo.App. 480, 210 S.W.2d 739, 745 (1948) (an individual member of an unincorporated association who signs as an officer is not liable for association's debt absent a personal promise). These cases applied agency principles properly and reached the correct result on the facts. The tort cases relied on by the majority are not on point. The cases simply apply general tort principles that result in tort liability when an individual commits tortious acts. *See Lawson v. Clawson*, 177 Md. 333, 9 A.2d 755 (1939); *Lyons v. American Legion Realty*, 172 Ohio St. 331, 175 N.E.2d 733 (1961). The same principles apply to corporations, i.e., corporate law does not immunize the tortfeasor. A tortious act results in liability even if an individual is an agent for a properly formed corporation, absent statutory restrictions on liability. I note that, in Maryland, individuals who are members or officers of charitable or civic unincorporated associations have immunity from liability for simple negligence if the association carries liability insurance in specified amounts. CJP § 5–406.

In some of the tort cases cited by the majority, the question was whether a member could sue his/her unincorporated

association in tort based on the negligence of a member, an issue even further removed from the one before us. *See Schlosser v. Grand Lodge of Brotherhood of Railroad Trainmen,* 94 Md. 362, 50 A. 1048 (1902); *Cox v. Thee Evergreen Church,* 836 S.W.2d 167 (Tex.1992). At common law, a member could not sue the association because, under agency principles, all members were both principal and agent and the negligence of the tortfeasor was imputed to the injured member. In *Schlosser* and *Cox,* the Courts held that the member could sue the association.

*Laflin & Rand Powder Co. v. Sinsheimer,* 46 Md. 315, 321–322 (1877), and *Cranson v. Int'l Business Machines Corp.,* 234 Md. 477, 489, 200 A.2d 33 (1964), are not on point and marginally relevant, if at all. To the extent they are relevant, they support the view expressed in this dissent. In both cases, the Court declined to treat defectively organized corporations as unincorporated associations and found no liability on the part of members or officers when the creditor had no factual reason to rely on the liability of individuals. *Cf. Stone v. Guth,* 232 Mo.App. 217, 102 S.W.2d 738 (1937) (defendant purported to be a corporation but was not; non-participating officers and members not liable for plaintiff's wages).

The remaining cases cited by the majority are not instructive. In *Snowden v. Crown Cork & Seal Co. of Baltimore City,* 114 Md. 650, 80 A. 510 (1911), the issue was whether an *inter vivos* gift to an unincorporated association was valid. The Court concluded that it was. In *Heleniak v. Blue Ridge Ins. Co.,* 162 A.D.2d 1041, 557 N.Y.S.2d 229 (1990), the question was whether there was a duty to defend the individual named insured, who was a member of an unincorporated association, under a homeowners policy. *Jenkinson v. Wysner,* 125 Mich. 89, 83 N.W. 1012 (1900) involved a suit on a lease. The facts are unclear, but the was prior litigation in which certain issues were not contested. In the case cited, the court held that principles of *res judicata* applied.

Finally, I note that there are sound public policy considerations supporting potential liability by those who join together

for their benefit. It is the opposite with respect to volunteers who give their time and talents for the public good, not for their personal benefit. Under the majority holding, I cannot conceive why a reasonable person would agree to volunteer time and talent to a nonprofit unincorporated association, even if the activities, without question, are solely in the public interest.

I respectfully dissent.